# Illinois Official Reports

## Appellate Court

---

**City of Chicago v. Concordia Evangelical Lutheran Church, 2016 IL App (1st) 151864**

---

| | |
|---|---|
| Appellate Court Caption | THE CITY OF CHICAGO, a Municipal Corporation, Plaintiff, v. CONCORDIA EVANGELICAL LUTHERAN CHURCH, Defendant-Appellee (CR Realty Advisors, Receiver-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-1864 |
| Filed | December 8, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-M-1403327; the Hon. Joseph M. Sconza, Judge, presiding. |
| Judgment | Affirmed in part, reversed in part; cause remanded with directions. |
| Counsel on Appeal | Brown Udell Pomerantz, Ltd., of Chicago (Shorge Sato, of counsel), for appellant.<br><br>Burke, Warren, MacKay & Serritella, P.C., of Chicago (James C. Geoly and Mark O. Stern, of counsel), for appellee. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Ellis and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1    Receiver CR Realty Advisors, LLC (CR Realty), appeals several of the trial court's orders, arguing that (1) the trial court erred by reviewing its "hard costs" under an *ex post facto* "reasonableness" standard and by holding an evidentiary hearing as to its accounting, (2) the court erred by denying CR Realty's motion *in limine*, (3) the evidence did not support the court's reduction to CR Realty's accounting, and (4) the court erred by summarily denying CR Realty's motion for approval of final accounting.

¶ 2    For the following reasons, we affirm in part, reverse in part, and remand with directions.

¶ 3                              I. BACKGROUND

¶ 4                    A. The Procedural History of This Case

¶ 5    On November 18, 2013, the City of Chicago (City) filed a complaint for equitable and other relief against defendant, Concordia Evangelical Lutheran Church (Concordia). The City alleged, *inter alia*, that the steeple of a church owned by Concordia was in imminent danger of collapse and needed to be removed because it was leaning toward Belmont Avenue. The City also filed an emergency petition for the appointment of a limited receiver pursuant to section 11-31-2 of the Illinois Municipal Code (Code) (65 ILCS 5/11-31-2 (West 2012)).

¶ 6    A hearing on the City's emergency receiver petition commenced that day. Inspector Jose Aparicio testified the steeple of the church was "swaying" and that the steeple and mansard roof were water damaged, were imminently dangerous and hazardous to the public, and had to be removed immediately. The City requested that the trial court grant the emergency receiver petition and appoint CR Realty as limited receiver. The City further requested that CR Realty be authorized to employ Green Demolition (Green) as its demolition contractor.

¶ 7    The trial court granted the emergency receiver petition and appointed CR Realty as limited receiver, with directions to (1) immediately remove the steeple and mansard roof, (2) remove and store three church bells inside the garage, and (3) place a rubberized flat roof over the open area left by removal of the steeple and mansard roof. The court ordered CR Realty to have Green submit an itemized cost sheet of all time, labor, and materials used to perform the work. The court's order authorized CR Realty to retain counsel, employ agents to assist in the performance of its receivership duties, and issue receiver's certificates for the costs and expenses of the receivership.

¶ 8    The work at the church was performed between November 18 and November 21, 2013. On December 18, CR Realty filed a motion for approval of accounting for the period of time between November 18 and December 18. CR Realty divided its costs into two categories: (1) "hard costs," or its out-of-pocket expenditures to third-party vendors (excluding legal) for which it was seeking reimbursement, and (2) "soft costs," or those costs CR Realty incurred in performing the work. It requested the issuance of one receiver's certificate for its "hard costs," in the amount of $111,312.17, and one for its "soft costs," in the amount of $20,697.50, which reflected its professional fees and legal expenses.

¶ 9    CR Realty attached to its motion, *inter alia*, a cost sheet from Green detailing Green's time, labor, and equipment charges. It also attached its own timesheet and invoices from two other entities that performed work on the project, Contractor's Access and Imperial Crane Services, Inc. (Imperial). In addition, CR Realty attached an expense register in which it

summarized its own fees and costs, its payments to Contractor's Access and Green, and its third-party markup fee. It listed the following expenses: $3375 for Contractor's Access; $102,556.59 for Green; $5300.58 for its third-party markup; and $19,197.50 for its own fees.

¶ 10 In a December 18, 2013, agreed order, the trial court allowed Concordia 35 days to respond to CR Realty's accounting.

¶ 11 The parties dispute whether Concordia ever filed objections to the accounting. Concordia's motion for reduction of damages appears in the appendix to CR Realty's brief; however, it is not file-stamped, and Concordia has not provided a record citation for the motion. In a footnote in a later filing in the trial court, CR Realty stated it could not be certain when Concordia filed its objections, if at all, because the copy of the motion for reduction of damages tendered to CR Realty contained no file stamp and was not accompanied by a notice of filing, notice of motion, or certificate of service. Based on this, it appears Concordia may have provided CR Realty and the court with copies of the motion for reduction of damages without actually filing the document in court.

¶ 12 In the motion for reduction of damages, Concordia stated it had contracted with independent consultant J. Bradley Sargent, who reported that CR Realty's charges were undocumented and unsubstantiated, egregiously excessive, and inconsistent. The motion evidently included as an attachment Sargent's report detailing the various charges that he challenged.[1] Sargent disputed a total of $54,674. Specifically, he objected to all of the Contractor's Access charge; $34,489 of the Green charge; $5301 of CR Realty's third-party markup; and $11,510 of CR Realty's own fees.

¶ 13 In September 2014, the trial court entered an agreed order allowing CR Realty to reply to Concordia's amended objections to the accounting. In October 2014, CR Realty filed its reply, arguing its motion for approval of accounting should be granted in full.

¶ 14 At a hearing on November 3, 2014, the trial court granted CR Realty leave to supplement its accounting based on Sargent's objections. The court continued the matter for an evidentiary hearing.

¶ 15 On November 19, 2014, CR Realty filed its supplement, attaching thereto, *inter alia*, affidavits from CR Realty principal Josh Nadolna and CR Realty employee Phillip Curtis Bettiker, as well as a purported bid from Imperial to Green. These documents are discussed in greater detail later in this opinion.

¶ 16 On November 20, CR Realty filed a motion *in limine* to strike and bar Sargent's testimony and to disqualify him as an expert witness. CR Realty argued, *inter alia*, that Sargent's testimony was not based on any generally accepted methodology, it improperly invaded the judicial fact-finding function of the court, and Sargent's opinion testimony was fundamentally unreliable and, in many respects, wrong or unfounded.

¶ 17 B. The Motion *in Limine* Hearing

¶ 18 A hearing commenced in December 2014. Sargent testified that he was a certified forensic accountant, specializing in financial investigations and in providing expert testimony. He reviewed CR Realty's billing file but not the supplemental accounting that CR

---

[1]Directly behind the motion for a reduction of damages that appears in the appendix is Sargent's *curriculum vitae* and report.

- 3 -

Realty filed. He described the methodology he employed in this case as the "generally accepted accounting principles that talk about being professionally skeptical of evidence that's presented to you." He also adhered to Statement of Auditing Standard No. 106, which he testified "very clearly identifies sufficiency of evidence for accounting." The "actual work" that Sargent did was "simple math for the most part, simple math and reviewing documents in detail."

¶ 19    Following Sargent's testimony, the trial court denied CR Realty's motion *in limine* and qualified Sargent as an expert, stating it believed Sargent could be of assistance.

¶ 20                    C. The Evidentiary Hearing on CR Realty's Accounting

¶ 21    Thereafter, an evidentiary hearing on the reasonableness of CR Realty's fees commenced. In the interest of brevity, we provide a brief overview of the evidence presented but only set forth in detail the evidence pertinent to the issues before us.

¶ 22                    1. Evidence Regarding the Work Completed at Concordia

¶ 23    CR Realty principal Josh Nadolna testified that he arrived at Concordia prior to the emergency receiver hearing, after receiving a call from corporation counsel for the City. Nadolna went into the steeple and discussed ideas regarding its removal with a city engineer and an engineer appointed for Concordia. Nadolna billed time for this meeting and for the emergency receiver hearing. He testified that in appointing CR Realty as receiver, the trial court did not require CR Realty to engage in a feasibility report or competitively bid for the project. He further testified that no cap was placed on the amount CR Realty could spend to perform the work, no restrictions were placed on the means by which CR Realty was to perform the work, and no form of accounting was required, other than the submission of Green's itemized cost sheet.

¶ 24    Michael James Brough, the operating manager/owner of Green, testified that he did not provide a written estimate to CR Realty before the project because "[i]t would be impossible to bid a job that there is so many unforeseens on [*sic*]." Brough also testified that CR Realty did not provide him with a spending cap or budget. According to Brough, seven Green laborers, including himself, worked at Concordia on November 18. The laborers performed "shoring" or "bracing" on the steeple.

¶ 25    Nadolna recalled three Contractor's Access laborers also being on-site on November 18 to shore the exterior of the steeple. The invoice for Contractor's Access shows that it charged CR Realty for "PORT TO PORT CHURCH STEEPLE EMERGENCY JOB." The invoice indicated a three-man crew worked from 3:30 to 11 p.m. but did not contain any other details regarding the work that was performed. The trial court admitted into evidence a copy of a check showing CR Realty paid the Contractor's Access invoice in full.

¶ 26    Nadolna, Bettiker, and CR Realty employee Ed White met with parishioners on November 18. Concordia member Ralph Krueger said Nadolna spoke to the parishioners for about an hour and a half, on and off. Nadolna testified the church members were uncooperative and vowed to call the newspapers to slander CR Realty.

¶ 27    Nadolna also spoke to LaGrange Crane and the Illinois Department of Transportation regarding the transportation of the crane. The LaGrange crane arrived to Concordia at around 10 p.m. After going into the steeple, however, the crane operator elected not to perform the

job. White testified the operator "got cold feet" and thought the steeple was going to fall apart. The LaGrange operator left around midnight. Nadolna subsequently met with Brough, White, Bettiker, and a City engineer to discuss other options for the steeple's removal. Nadolna set up a meeting with Jay Mooncotch of Imperial, another crane company, for the next day.

¶ 28 White and Nadolna returned to the site on November 19 at approximately 6 or 6:30 a.m. Brough was also present. They waited in Brough's car until Mooncotch arrived. When he arrived, Mooncotch confirmed that Imperial would perform the work. Nadolna testified he verbally approved Imperial's proposal to Green. The Imperial cranes arrived at 2:30 p.m. Nadolna, Green, and the crane operators formulated a "[p]lan of action" to remove the steeple in two parts. At some point, CR Realty was also "made aware" that Concordia wanted to save the cross. The cross was removed before the steeple and transported to a nearby yard in a forklift.

¶ 29 According to CR Realty's timesheet, the first piece of steeple was removed at approximately 1:00 a.m. Removal of each section of the steeple took "several hours." Krueger testified the second portion of the steeple was removed at around 5 a.m.

¶ 30 Hickman testified the steeple was composed of copper dipped in lead and that somebody who valued the copper at $14,000 had offered to purchase the steeple from Krueger. Krueger testified that somebody from AVR Reclamation told him the copper in the steeple could be worth between $7000 and $15,000. Krueger did not ask Nadolna to preserve the steeple, but Krueger believed that somebody from Preservation Chicago did. Hickman testified somebody from the Chicago Preservation Society informed CR Realty that the steeple was a potential historical landmark. Krueger testified he told Brough and the demolition laborers that the steeple should be preserved. Hickman likewise testified Concordia congregants told the construction crew that the steeple should be preserved. However, after the steeple sections were removed, they were placed in the street, broken down, and placed in dumpsters on-site, which were continuously filled and removed throughout the project.

¶ 31 White testified that he worked a continuous 27-hour shift from November 19 through November 20. He did not recall taking any extended breaks during this shift; he only remembered taking a half-hour or 45-minute break to get food. Bettiker testified that he spent 14 hours at the site on November 19. Brough testified that eight Green laborers, including him, were present on November 19.

¶ 32 On November 20 and November 21, Green laborers constructed a roof to cover the hole that remained after the steeple's removal.

¶ 33 Following the project, Green submitted its invoice to CR Realty. The trial court admitted the invoice into evidence, along with checks showing CR Realty paid the invoice. The invoice breaks down each of Green's laborer's time into "straight time," "over time," and "double time." Brough testified Green was required to use union laborers for the project, and union rules dictated what constituted "straight time," "over time," and "double time." Green's invoice also listed equipment fees, including an Imperial charge, and charges for overhead and profit.

¶ 34                    2. John Bradley Sargent's Testimony[2]

¶ 35        Sargent found that $54,674 of the charges were unsubstantiated, including $3375 for Contractor's Access, $34,489 for Green, $11,510 for CR Realty's own fees, and $5301 for CR Realty's third-party markup.

¶ 36        Sargent explained that in determining whether charges were substantiated, he was looking for "some sort of proof of costs incurred that it was there; invoicing, receipts, something." In making his determination, Sargent used "the litmus" test of "what [he] would be willing to pay on this bill," and "that is what's substantiated, what's supported."

¶ 37        In preparing his memorandum, Sargent reviewed the documents attached to CR Realty's motion for approval of accounting. After the motion *in limine* hearing, he received CR Realty's supplement to accounting, which reinforced his finding that $54,674 of the charges were unsubstantiated.

¶ 38        Some of the numbers that Sargent used in his report differed from those shown in CR Realty's expense register. For example, Sargent wrote in his report that CR Realty invoiced $102,634 for the amount it paid to Green and that it sought $18,878 for its own fees. However, CR Realty's expense register shows it invoiced $102,556 for Green and sought $19,197.50 for its own fees. When confronted with these discrepancies, Sargent acknowledged he could have made a mistake; however, he believed a "high probability" existed that he reviewed a document with the same title that contained different data. Sargent was asked whether it was possible that the numbers in his report were wrong, and he responded, "I don't believe so." When questioned again whether it was "possible" that his numbers were incorrect, Sargent stated, "[a]nything is possible" and that he was "human" and "[e]verybody makes mistakes." Sargent was shown the Green invoice, which showed that Green invoiced the same amount that was listed on CR Realty's expense register. Sargent testified he had "more faith in [his] data than what [he was] seeing."

¶ 39        Sargent found the entire amount billed for Contractor's Access was unsubstantiated. He testified the invoice appeared to be for scaffolding because it said "Scaffold Solutions" at the top; however, the invoice neither showed a rental fee for equipment or charges for removal of scaffolding after the completion of the job, nor indicated with any specificity what Contractors Access did.

¶ 40        Sargent also found that $34,489 of Green's fees were unsubstantiated. He deducted, *inter alia*, $2900 from the amount listed for Imperial and $6109 for the amount listed for Green's labor. Both of these deductions were based on an assumption that when an Imperial or Green laborer arrived on the jobsite, he would charge the first eight hours he worked as straight time, then take an uncompensated 30-minute break, then charge overtime. Sargent acknowledged his calculation did not take into account Imperial's billing policy, which was that hours worked between 7 a.m. and 3:30 p.m. were billed as straight time and that any time after 3:30 p.m. was billed as overtime. He acknowledged that Imperial's invoice showed it billed straight time for the hours worked between 12:30 to 3:30 p.m., and billed overtime for the hours worked from 3:30 to 8:30 p.m. Sargent had no information to suggest the Imperial laborers actually took 30-minute breaks; however, he noted one laborer billed for 20 straight hours and another billed for 15.5 straight hours.

_____

[2]The record does not contain Sargent's testimony on direct examination.

¶ 41    Sargent was asked about the purported bid from Imperial to Green that was included in CR Realty's supplemental accounting. This bid set forth the straight and overtime rates and hours of Imperial's laborers. It was dated November 19, 2014, the same date that CR Realty filed its supplement. Affidavits from Nadolna and Bettiker, which were likewise submitted with CR Realty's supplemental accounting, also erroneously used the date of November 2014 instead of November 2013. The bid was not signed.

¶ 42    Sargent found the bid from Imperial to Green to be "highly unreliable." He found the fact that the bid and Nadolna's and Bettiker's affidavits all erroneously used 2014 instead of 2013 was highly indicative of three entities with the same economic interest operating in concert. Further, he testified, the bid was not signed. Based on the foregoing, Sargent opined the bid was not what was actually sent by Imperial to Green and was in fact "clearly created a year later." Sargent acknowledged that the bid contained the same date as the filing of CR Realty's supplemental accounting. Counsel for CR Realty asked Sargent whether it was possible that the bid contained a field date that automatically updated to the date on which the file was opened. Sargent responded, "Anything is possible."

¶ 43    Sargent also observed that the bid from Imperial to Green was addressed to "Michael Green," instead of Michael Brough. Imperial's invoice was sent to "Mike Buff." Counsel for CR Realty asked Sargent "[i]f I said that his name was Michael Brough, B-r-o-u-g-h, would that explain why the invoice is issued to a Mike Buff, B-u-f-f, possibly?" Sargent responded, "Anything is possible." When asked to acknowledge that Brough and Buff sounded familiar, Sargent said he "would be speculating as to an explanation." Counsel asked Sargent, "It doesn't affect your opinion as to the reliability of the invoice or the bid that somebody's last name was either put in wrong or misspelled, correct?" Brough responded that the name "Buff" could be interpreted as a nickname, which would "possibly" be "indicative" of "the closeness of the relationship" between Imperial and Green.

¶ 44    When asked about Statement of Auditing Standard No. 106, Sargent testified that he was "citing to it" but was "not sure if" he was "relying on it." He clarified that he was "talking more about the overarching principles of sufficiency of evidence and professional skepticism." Sargent agreed that, based on Statement of Auditing Standard No. 106, his duty was to obtain other audit evidence beyond simply the accounting before rendering an audit opinion. Sargent did not attempt to interview Nadolna, CR Realty's accountant, or the outside vendors. He could not recall the type of outside research he performed but he "certainly looked at the evidence [the outside vendors] submitted." He did not attempt to gather any outside audit evidence because it "was outside of [the] scope of what [he] was asked to do." He explained that he was asked to review the documents that were provided by the receiver. He clarified that as an auditor, the scope of his work is to render an opinion on the reliability of financial statements, but his work on this case was "a very different exercise." Later, he testified that he was not performing an audit; he was "performing expert testimony in a forensic review."

¶ 45    Sargent reduced CR Realty's $5301 markup to $0 because he believed the invoices already contained "a substantial markup."

¶ 46                    D. The Trial Court's Ruling on the Initial Accounting Motion

¶ 47    In May 2015, the trial court issued its ruling on CR Realty's accounting motion. In doing so, the court emphasized that although it would not be "going to go line down like an

accountant in [its] ruling," it had considered the totality of the evidence in reaching its decision. The court stated that it found Concordia's witnesses' testimony to be "honest and forthright and, furthermore, their demeanor excellent." By contrast, the court found that CR Realty's witnesses provided testimony that was "contradictory, inconsistent and evasive." The court also found that, aside from White, the demeanor of CR Realty's witnesses was "poor at best."

¶ 48   The court found that the Contractor's Access amount was unreasonable by $1300, the Green entry was unreasonable by $21,537, the 5% third-party markup was unreasonable by $2650, and CR Realty's fees were unreasonable by $9413.75. Accordingly, the court subtracted $34,900.75 from the amount CR Realty requested and approved an award of $97,108.92.[3]

¶ 49                    E. The Court's Ruling on CR Realty's Motion for Final Accounting

¶ 50   Thereafter, CR Realty filed a motion for approval of final accounting for the period from December 12, 2013, through May 21, 2015. In the motion, CR Realty sought $8715 in fees and $52,375.05 in attorney fees and costs incurred during this time period, for a total of $61,090.05.

¶ 51   In June 2015, the trial court denied CR Realty's second accounting motion, finding attorney fees were not statutorily authorized and the parties did not contractually agree to them. The court discharged CR Realty *nunc pro tunc* to the date of the case's dismissal, May 22, 2015.

¶ 52   This appeal followed.

¶ 53                                          II. ANALYSIS

¶ 54   On appeal, CR Realty argues that (1) the trial court erred by reviewing its "hard costs" under an *ex post facto* "reasonableness" standard and by holding an evidentiary hearing as to its accounting; (2) the court erred by denying CR Realty's motion *in limine*; (3) the evidence did not support the court's reduction to CR Realty's accounting; and (4) the court erred by summarily denying CR Realty's motion for approval of final accounting. We address CR Realty's arguments in turn.

¶ 55                    A. The Trial Court's Decision to Hold an Evidentiary Hearing on the
                            "Reasonableness" of CR Realty's "Hard Costs" and "Soft Costs"

¶ 56   CR Realty argues the trial court erred by applying an *ex post facto* "reasonableness" standard to review and reduce CR Realty's "hard costs," and that the court erred by holding an evidentiary hearing on the reasonableness of any of CR Realty's fees. "The test for determining whether an award of receiver's fees is excessive is whether there has been a clear abuse of discretion." *Plote, Inc. v. Minnesota Alden Corp.*, 95 Ill. App. 3d 5, 7 (1981). However, to the extent one of CR Realty's arguments is that the court employed the incorrect legal test to review its "hard costs," we review that issue *de novo*. See *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 13 (the issue of whether the court applied

---

[3]Because the property had been brought into compliance by CR Realty, the City dismissed its first amended complaint.

the correct legal test to the evidence presented was a question of law, for which the standard of review was *de novo*).

¶ 57   Section 11-31-2(a) of the Code provides that "[i]f the appropriate official of any municipality determines, upon due investigation, that any building or structure therein fails to conform to the minimum standards of health and safety as set forth in the applicable ordinances of such municipality, and the owner or owners of such building or structure fails, after due notice, to cause such property so to conform, the municipality may make application to the circuit court for an injunction requiring compliance with such ordinances or for such other order as the court may deem necessary or appropriate to secure such compliance." 65 ILCS 5/11-31-2(a) (West 2012). If the court appoints a receiver to bring the building or structure into compliance, the court may "authorize the receiver to recover the cost of such maintenance, repair and rehabilitation by the issuance and sale of notes or receiver's certificates bearing such interest as the court may fix." 65 ILCS 5/11-31-2(a) (West 2012).

¶ 58   In *Plote*, the court set forth the following framework to be employed when a receiver requests fees:

"A petitioner who requests an award of fees must submit enough evidence on the reasonableness of the fees to permit the trial court to make a reasoned decision based on the applicable law. *** This does not mean that there must be an evidentiary hearing on every petition for fees. In the typical case, where a petition for fees is supported by a time sheet which details the receiver's activities, and which shows other factors relevant to an award of fees, this can be sufficient to establish that the fees requested are reasonable. [Citation.] After sufficient evidence of reasonableness is presented, the burden shifts to the respondent to show that the fees are not reasonable." *Plote*, 95 Ill. App. 3d at 7.

¶ 59   The receiver in *Plote*, who was appointed during a mortgage foreclosure action, filed a petition seeking fees but did not attach any activity reports to the petition. *Id.* at 6-7. The appellate court found the receiver failed to submit sufficient evidence to show his fees were reasonable. *Id.* at 8. Accordingly, the court reversed the award of the receiver's fees and remanded to allow the receiver an opportunity to present sufficient supporting evidence. *Id.* The receiver's petition also requested over $5000 in fees for the receiver's accountants, which the accountants purportedly incurred in preparing the final report. *Id.* at 6. The petition identified the work for which the accountant's fees were requested and included, as an attachment, the accounting firm's bill, which listed the employees who worked on the project and their hourly rates and time totals. *Id.* at 8. The *Plote* court found "the request for accountants' fees was sufficiently supported by evidence of reasonableness," as it showed that five employees, charging an average of about $40 an hour, spent more than 200 hours preparing the final report. *Id.* Accordingly, the appellate court concluded that sufficient evidence was presented from which it could determine the trial court did not abuse its discretion by awarding the accountants' fees. *Id.* Further, the *Plote* court stated, because the appellants presented no evidence to show the rates charged or hours expended were unreasonable, nothing in the record existed to rebut the trial court's conclusion that the accountants' fees were reasonable. *Id.* Subsequent to *Plote*, the court employed the burden-shifting "reasonableness" framework in *Brackett v. Sedlacek*, 116 Ill. App. 3d 978, 979-82 (1983), where the trial court ordered the dissolution of a corporation and appointed a

receiver for the corporation, and the receiver and his attorney later filed motions for payment of fees. *Id.*

¶ 60 CR Realty argues the burden-shifting "reasonableness" framework in *Plote* and *Brackett* applies only to a receiver's "soft costs," or its professional fees, including the fees of its litigating attorneys and accountants. According to CR Realty, this burden-shifting "reasonableness" test has never been applied to deny a receiver the reimbursement of its "hard costs" or its actual, out-of-pocket expenditures made in the performance of its receivership duties. CR Realty posits that "courts have long reviewed the fees of [a] receiver's professional agents as part of and with the same scrutiny as the receiver's own fees" and maintains that it is customary for a receiver to wait to pay its accountants and attorneys until the court approves their invoices. However, CR Realty argues, receivers must sometimes "pay market price on market terms" for goods and services from other third-party vendors and then seek reimbursement later. CR Realty claims that *Plote* and *Brackett* should not apply to a receiver's request for reimbursement for these expenditures; instead, CR Realty argues, the receiver should only have to present proof that it paid the third-party invoices. CR Realty also maintains that allowing courts to consider the "reasonableness" of a receiver's "hard costs" will "guarantee that no capable, independent, private party" will undertake the performance of emergency receiver jobs.

¶ 61 We find that the trial court did not err by considering the "reasonableness" of CR Realty's "hard costs" according to the framework set forth in *Plote* and *Brackett*. Neither *Plote* nor *Brackett* stated or implied that the "reasonableness" burden-shifting test should apply only to a receiver's own fees or the fees of its lawyers and accountants but not the receiver's other expenditures. None of the authority on which CR Realty relies warrants a finding that, with receiver's fees, courts should draw a distinction between a receiver's "hard costs" and "soft costs." We do not find CR Realty's rationale persuasive as to why such a distinction should be made. If the court were unable to consider the "reasonableness" of a receiver's costs, the receiver would have little incentive to ensure its expenditures to third parties were reasonable, as it could simply seek reimbursement for any amount it paid. We note that CR Realty suggests that the court could still consider the reasonableness of third-party invoices in the event that "compelling evidence" was presented "that the charges are fraudulent or grossly inflated or that the receiver did not perform the court order." Yet, CR Realty does not articulate how the "compelling evidence" standard would be met. As Concordia points out, in this case, CR Realty's own timesheets showed that White billed 27 hours on November 19; such evidence, on its face, could certainly raise a question as to whether CR Realty's charges or the third-party charges of the entities CR Realty employed were "fraudulent or grossly inflated."

¶ 62 CR Realty also argues that the trial court did not apply a "reasonableness" standard but instead employed a more scrutinizing "thorough substantiation" test. CR Realty relies on certain comments the court made during Sargent's cross-examination to argue the court's test was whether CR Realty's charges were "documented to Concordia's satisfaction (or to the satisfaction of Mr. Sargent)." We are not persuaded. Although Sargent found approximately $54,000 of CR Realty's fees were unsubstantiated, the court only reduced CR Realty's fees by approximately $34,000; clearly, then, the court was not allowing reimbursement only for those charges Sargent found sufficiently documented. CR Realty also posits that if the court concluded CR Realty's fees were unreasonable because they were not properly supported,

the court should have simply identified the areas of deficiency and directed CR Realty to supplement its accounting. In support thereof, CR Realty cites *Plote*, in which the court remanded the case for the receiver to have the opportunity to present sufficient supporting evidence. See *Plote*, 95 Ill. App. 3d at 8. However, *Plote* does not stand for the proposition that the court was required to allow CR Realty to present additional evidence, particularly where CR Realty had already filed a supplemental accounting motion in response to Sargent's report finding several charges unsubstantiated. In sum, the trial court properly applied the *Plote* burden-shifting framework to consider the reasonableness of CR Realty's expenditures to third parties.

¶ 63    CR Realty next argues that the trial court abused its discretion by holding an evidentiary hearing on its fees before Concordia satisfied its burden of showing those fees were unreasonable. See *id.* at 7 (after a receiver submits enough evidence on the reasonableness of its fees, "the burden shifts to the respondent to show that the fees are not reasonable"). CR Realty argues that Concordia failed to meet its burden because it did not file a response to CR Realty's accounting. Further, CR Realty contends, Concordia's unfiled "Motion for Reduction of Damages" simply raised questions about CR Realty's accounting and was therefore insufficient to show CR Realty's fees were unreasonable.

¶ 64    We find no error in the trial court's decision to hold an evidentiary hearing on the reasonableness of CR Realty's fees. First, as to CR Realty's argument that Concordia never filed its "Motion for Reduction of Damages," we note that CR Realty proceeded in the trial court as if Concordia did file that motion. In October 2014, CR Realty filed a reply in support of its motion for approval of accounting in which it represented that "on or about July 23, 2014" Concordia submitted a " 'Motion for Reduction of Damages' " (Objections). CR Realty then qualified its statement with a footnote in which it explained it could not "be certain when exactly the Objections were filed, if at all, as the tendered copy contained no file stamp and was not accompanied by a notice of filing, notice of motion or certificate of service." The rest of CR Realty's reply was devoted to arguing the merits of Concordia's objections. When the trial court asked Concordia at a later hearing whether its objections had been noted in writing, CR Realty did not indicate to the court that Concordia's objections were unfiled, nor did it object when counsel for Concordia responded, "Yes, [Y]our Honor." The record shows that CR Realty, Concordia, and the court all proceeded in a manner as if Concordia had filed its objections. Under these circumstances, it would be unfair to now allow CR Realty to challenge the court's evidentiary hearing on the basis that Concordia's objections were unfiled. See *Fleming v. Moswin*, 2012 IL App (1st) 103475-B, ¶ 92 ("[u]nder the doctrine of invited error, a party may not request to proceed in one manner and then later contend on appeal that the course of action was in error" (internal quotation marks omitted)).

¶ 65    Further, CR Realty's argument that it was "actually prejudiced and ambushed at trial" by Concordia's alleged failure to file the accounting is unpersuasive. CR Realty notes that during its cross-examination of Sargent, Sargent referred to an attachment to his report that counsel for CR Realty and the court did not have. CR Realty argues that although its attorney was then provided with the document, counsel was forced to continue with his cross-examination "without more than a few minutes to prepare." However, CR Realty did not object to continuing with its cross-examination on that basis or ask the court for additional time to review the document. Accordingly, it is disingenuous for CR Realty to now claim it suffered prejudice.

¶ 66    We also disagree with CR Realty's contention that, even taking into account the "Motion for Reduction of Damages," the trial court erred by holding an evidentiary hearing on the reasonableness of CR Realty's accounting. CR Realty argues that, at most, Sargent's report "simply raised questions about [CR Realty]'s accounting" and that because the purpose of *Plote* is to determine whether an evidentiary hearing is even necessary, the court erred by allowing Concordia to attempt to meet its burden of showing the fees were unreasonable through live witness testimony. We disagree. In *Plote*, the court stated that an evidentiary hearing on a fee petition is not always necessary and that when a receiver presents *prima facie* evidence of the reasonableness of its fee request, the burden shifts to the respondent to show the fees are unreasonable. *Plote*, 95 Ill. App. 3d at 7. However, *Plote* did not state that a respondent must meet its burden before it is entitled to an evidentiary hearing. Here, the trial court had the authority to hold an evidentiary hearing especially where some of the entries in CR Realty's accounting were questionable on their face, such as White's entry reflecting that he worked 27 hours in one day, and where Concordia submitted a report by an accountant detailing the charges that he found to be unsubstantiated.

¶ 67                    B. The Trial Court's Denial of CR Realty's Motion *in Limine*

¶ 68    CR Realty next claims that the trial court committed reversible error by denying its motion *in limine* to bar Sargent's testimony. CR Realty argues that (1) Sargent's opinion testimony was inadmissible because he did not use specialized knowledge to assist the court; (2) his testimony should have been excluded as incompetent where he denied reviewing CR Realty's accounting and listed different amounts in his report than those listed on CR Realty's expense register; and (3) his opinion testimony should have been excluded because it was based on assumed facts that were either unproven or affirmatively disproven.

¶ 69    Initially, Concordia responds that we lack jurisdiction to consider the trial court's denial of CR Realty's motion *in limine*. In its notice of appeal, CR Realty did not specify it was appealing the court's December 5, 2014, order in which the court denied the motion *in limine*. Instead, CR Realty specified that it was appealing the trial court's orders dated June 4, 2015; May 22, 2015; and November 3, 2014, "amongst other orders entered in this matter." Concordia also argues that CR Realty did not include a copy of the transcript pages from the motion *in limine* hearing in its appendix, in violation of Illinois Supreme Court Rule 342(a) (eff. Jan. 1, 2005).

¶ 70    Pursuant to Illinois Supreme Court Rule 303(b)(2) (eff. Jan. 1, 2015), our court has jurisdiction only to review the judgments or parts of judgments specified in or inferred from the notice of appeal. *Fitch v. McDermott, Will & Emery, LLP*, 401 Ill. App. 3d 1006, 1014 (2010). However, a notice of appeal will be deemed to include an unspecified interlocutory order where that order was a step in the procedural progression leading to the judgment specified in the notice of appeal. *CitiMortgage, Inc. v. Hoeft*, 2015 IL App (1st) 150459, ¶ 8.

¶ 71    Here, one of the judgments specified in CR Realty's notice of appeal was the trial court's May 2015 order, granting in part and denying in part CR Realty's motion for approval of accounting. The court issued the May 2015 order based on the totality of the evidence presented at the evidentiary hearing, which included Sargent's testimony. Accordingly, the court's ruling on the motion *in limine* was a step in the procedural progression leading to the May 2015 order. Further, while Concordia alleges CR Realty violated Rule 342(a), violation of that rule "does not divest this court of jurisdiction." *Zadrozny v. City Colleges of Chicago*,

220 Ill. App. 3d 290, 293 (1991). Accordingly, we have jurisdiction to review the court's denial of CR Realty's motion *in limine*.

¶ 72  We turn to the merits of CR Realty's arguments. Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Therefore, "[a] witness will be allowed to testify as an expert if his experience and qualifications provide him with knowledge that is not common to the layperson and where such testimony will aid the trier of fact." *Colella v. JMS Trucking Co. of Illinois, Inc.*, 403 Ill. App. 3d 82, 90 (2010). An expert's opinions are subject to the fundamental requirement that they have some evidentiary basis. *Davis v. Kraff*, 405 Ill. App. 3d 20, 34 (2010). Accordingly, "[w]hen the opinion of an expert is totally lacking in factual support it is nothing more than conjecture and guess and should not be admitted as evidence." (Internal quotation marks omitted.) *Id.*

¶ 73  The decision of whether to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 157; see also *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23 (a trial court's evidentiary rulings as to the admissibility of testimony and on a motion *in limine* are reviewed for an abuse of discretion). "A circuit court abuses its discretion when its ruling 'is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Taylor*, 2011 IL App (1st) 093085, ¶ 23 (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)).

¶ 74  First, we reject CR Realty's argument that Sargent's testimony could not have assisted the court because Sargent was not using "specialized knowledge" to form his opinion. It was for the trial court, not our court, to determine whether Sargent's testimony would be of assistance. As CR Realty points out, Sargent testified he was performing "simple math" and using "common sense and that he did not perform an audit in this case. Nonetheless, Sargent also testified that in reviewing the documents, he employed generally accepted accounting principles regarding sufficiency of the evidence and professional skepticism. He explained that in determining whether charges were substantiated, he was looking for "some sort of proof of costs incurred that it was there; invoicing, receipts, something." He used "the litmus" test of "what [he] would be willing to pay on this bill," and "that is what's substantiated, what's supported." Given Sargent's background as an accountant and his knowledge of generally accepted accounting principles, the trial court could reasonably have found Sargent could use his specialized knowledge to assist the court in determining the reasonableness of CR Realty's fees, even though Sargent did not perform an audit in this case and employed "simple math" and "common sense." Further, while CR Realty posits that Sargent's opinions about the ultimate issues in this case improperly invaded the province of the trier of fact, "[i]t is well settled that an expert may opine on an ultimate fact or issue as long as the other requirements for the expert testimony are met." *Lorenz v. Pledge*, 2014 IL App (3d) 130137, ¶ 27. Such testimony does not impermissibly intrude on the fact finder's role because the trier of fact is free to reject the expert's conclusion. *Zavala v. Powermatic, Inc.*, 167 Ill. 2d 542, 545 (1995). In this regard, we note the court did apparently reject part of Sargent's opinions, given that the court reduced CR Realty's fees by approximately $20,000 less than the amount listed in Sargent's report.

- 13 -

¶ 75        Equally meritless is CR Realty's claim that the trial court allowed Sargent to provide opinion testimony as to the credibility of witnesses with whom he had never spoken. CR Realty points to Sargent's testimony that (1) Green was not independent because it had an economic relationship with CR Realty and (2) Imperial and Green had a close relationship because the Imperial invoice misspelled Brough's name as "Buff." First, we note, counsel for CR Realty solicited this testimony during his cross-examination of Sargent. See *Fleming*, 2012 IL App (1st) 103475-B, ¶ 92 (the doctrine of invited error precludes a party from requesting to proceed in one manner and then later contending on appeal that the course of action was in error). Further, we perceive this testimony as Sargent explaining why he did not find certain documents substantiated CR Realty's fees, not Sargent testifying as to whether other witnesses were credible.

¶ 76        CR Realty next posits that Sargent's testimony should have been excluded as incompetent. CR Realty observes that Sargent's report contained different numbers than CR Realty's expense register and that, when confronted with these discrepancies, Sargent testified he had more faith in his own data than the numbers on Green's invoice and that he must have reviewed a different document. According to CR Realty, Sargent's refusal to admit his errors "and his insistence on a conspiracy theory that a different document containing different data was switched with the document that he reviewed" made Sargent's testimony incompetent and inadmissible. We disagree. Sargent did not insist on a "conspiracy theory" or that an "intentional deception" had been played on him, as CR Realty posits. Further, it is for the trier of fact to determine the credibility of witnesses, resolve conflicts in the evidence, and determine the weight to be given to the witness testimony. *Career Concepts, Inc. v. Synergy, Inc.*, 372 Ill. App. 3d 395, 405 (2007). The same rules of weight and credibility that are applicable to other witnesses are used to judge expert testimony. *Jones v. Police Board*, 297 Ill. App. 3d 922, 933 (1998). It was for the trial court to judge Sargent's credibility and the weight of his findings in light of his testimony that he did not review the accounting CR Realty filed.

¶ 77        Finally, we find unpersuasive CR Realty's argument that several of Sargent's opinions should have been excluded because they were based either entirely on conjecture or were affirmatively disproven by the record. In particular, CR Realty posits (1) Sargent found the Contractor's Access invoice was insufficient substantiation because he assumed the invoice was for scaffolding, when CR Realty's evidence showed it was for shoring; (2) Sargent made deductions to Imperial's and Green's labor charges based on his assumptions, which were ultimately disproven, regarding when straight time and overtime should have been billed; (3) Sargent discounted the "independent relationship" between Green and CR Realty when he stated that Green had an economic relationship and interest in the outcome of the case; and (4) Sargent rendered an opinion as to the "bias and possible collusive intent" between Nadolna, Bettiker, and Imperial, based on the Imperial "bid" and Bettiker's and Nadolna's affidavits all incorrectly using the year "2014" instead of "2013." CR Realty posits that because Concordia failed to prove up any of the assumptions underlying these opinions, Sargent's "unproven and speculative conclusions and opinions must be stricken."

¶ 78        CR Realty's challenges to Sargent's testimony do not warrant reversal. First, although the factual bases for some of Sargent's findings were ultimately called into question, this went to the weight of Sargent's testimony rather than its admissibility. See *Petraski v. Thedos*, 382 Ill. App. 3d 22, 31 (2008) ("The factual basis for an expert's opinion generally does not

affect his standing as an expert; it is for the [trier of fact] to determine the weight of the opinion."). The trial court allowed CR Realty to expose any weaknesses in Sargent's testimony during its cross-examination of Sargent. Further, even assuming, *arguendo*, that portions of Sargent's testimony were speculative or completely lacking in factual support, we presume a trial court considers only competent evidence (*Chicago City Bank & Trust Co. v. Ceres Terminals, Inc.*, 93 Ill. App. 3d 623, 631 (1981)), and there is no evidence to suggest the court relied on the testimony that CR Realty challenges. Thus, we find no cause for reversal of the court's denial of CR Realty's motion *in limine*.

¶ 79                                    C. The Trial Court's Reduction in Fees

¶ 80        CR Realty next challenges each of the trial court's reductions to its motion for approval of accounting. The court provided the following breakdown of its reductions: $1300 for the Contractor's Access amount; $21,537 for the Green amount; $9413.75 for CR Realty's fees; and $2650 for the third-party markup fee. The court did not detail the specific basis for each of its reductions, instead stating it had considered the totality of the evidence. It also indicated it found Concordia's witnesses presented "honest and forthright" testimony and had "excellent" demeanors, while it found CR Realty's witnesses presented "contradictory, inconsistent and evasive" testimony. The court stated that aside from the demeanor of Ed White, the demeanor of all of CR Realty's witnesses was "poor at best."

¶ 81        The parties agree that we should review the trial court's judgment under the manifest weight of the evidence standard. See *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995) (where testimony is conflicting in a bench trial, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence). Pursuant to this standard, reversal is warranted only where "an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Id.* However, we note that in *Plote*, the court stated that "[t]he test for determining whether an award of receiver's fees is excessive is whether there has been a clear abuse of discretion." *Plote*, 95 Ill. App. 3d at 7; see also *Brackett*, 116 Ill. App. 3d at 981 (citing the standard set forth in *Plote*). *Plote* and *Brackett* thus suggest an abuse of discretion standard applies when considering the propriety of a court's award of receiver's fees. Ultimately, we need not resolve which standard applies, as under either standard, we must reverse.

¶ 82        The record in this case shows the trial court made specific calculations as to each "category" for which CR Realty had requested fees, demonstrating the court clearly engaged in a thoughtful and detailed analysis of the evidence. Yet, the court failed to articulate its rationale for reducing CR Realty's fees. As a result, our ability to analyze whether the court's decision was manifestly erroneous or an abuse of discretion is severely hindered. Under these circumstances, we find the proper course of action is to remand to the trial court for the court to specifically state its reasons for each of its reductions to CR Realty's receiver's fees. See, *e.g.*, *Richardson v. Haddon*, 375 Ill. App. 3d 312, 316 (2007) (remanding where the trial court failed to provide an objective basis for its drastic reduction to fees sought in an attorney fee petition).

¶ 83        D. The Court's Denial of CR Realty's Motion for Approval of Final Accounting

¶ 84        Finally, CR Realty argues the trial court erred by denying its motion for final accounting in which sought its costs and expenses, including attorney fees, from December 18, 2013,

through May 22, 2015. The majority of these expenses were attorney fees and costs, as well as CR Realty's own professional fees spent preparing reports for the court and appearing before the court in this matter. CR Realty posits the court erred by denying its motion without applying the *Plote* and *Brackett* burden-shifting framework to consider the reasonableness of its fees. We agree.

¶ 85 The trial court denied CR Realty's petition on the basis that attorney fees were not statutorily authorized and the parties did not contractually agree to them. In doing so, the court appeared to be following the "American Rule," pursuant to which a party is responsible for his own attorney fees, and a successful litigant generally may not recover attorney fees absent statutory or contractual authorization. *Geisler v. Everest National Insurance Co.*, 2012 IL App (1st) 103834, ¶ 86. However, CR Realty was not one of the parties in the litigation between the City of Chicago and Concordia; instead, it was the receiver. Our court has recognized that "the accepted practice" is to regard "attorney's fees as more properly a part of the receiver's own fees." *Rosenblatt v. Michigan Avenue National Bank*, 70 Ill. App. 3d 1039, 1044 (1979). Moreover, although a substantial portion of CR Realty's attorney fees were incurred litigating its own motion for approval of accounting, in *Wright v. Matters*, 220 Ill. App. 131, 146 (1920), our court found that attorney fees could be awarded for the time an attorney spent defending a receiver's report before a master. More recently, the court in *Rosenblatt* found that attorney fees could be awarded for costs incurred by an attorney in securing and enforcing a judgment for receiver's fees, even though the receiver had been discharged. *Rosenblatt*, 70 Ill. App. 3d at 1044-45.

¶ 86 Nonetheless, Concordia argues that because CR Realty was statutorily appointed as a receiver pursuant to section 11-31-2(a) of the Code, we must strictly construe the receivership in accordance with section 11-31-2(a), which does not include the words "attorneys' fees." Concordia posits that the absence of "attorney's fees" language in section 11-31-2(a) is particularly significant because another section of the statute, section 11-31-1(a), does contain an attorney fees provision. See 65 ILCS 5/11-31-1(a) (West 2012). Concordia's argument is unpersuasive because our supreme court has explained that the trial court's power to appoint a receiver does not derive from section 11-31-2 of the Code but from the court's inherent equitable power. See *Community Renewal Foundation, Inc. v. Chicago Title & Trust Co.*, 44 Ill. 2d 284, 290 (1970) ("a reading of section 11-31-2 *** discloses no provision for the appointment of a receiver under the statute. The legislature recognized the inherent power of a court of equity to appoint a receiver and from this inferentially stated that a court of equity could reasonably find the appointment of a receiver appropriate in a situation *** where property has become unfit for use and dangerous because of continuing building code violations.").

¶ 87 Concordia posits, in the alternative, that the trial court did award CR Realty the fees it incurred in connection with the receivership work, as CR Realty completed its court-ordered work on November 21, 2013. However, a receiver's "duty to the court ceases only with the receiver's discharge" (*Robinson v. Ruprecht*, 147 Ill. App. 646, 653 (1909)), and CR Realty was not discharged until May 22, 2015.

¶ 88 Based on the foregoing, we reverse the trial court's order denying CR Realty's motion for final accounting and remand with directions for the court to apply the *Plote* burden-shifting framework to determine the reasonableness of the fees sought in CR Realty's motion for final accounting. We note CR Realty has requested, in its reply brief, that it be reinstated as

receiver for the limited purpose of concluding the accounting. However, CR Realty can raise this request in the trial court, and we leave it to the trial judge to rule on CR Realty's request.

¶ 89                                    III. CONCLUSION

¶ 90        For the reasons stated, we affirm the trial court's judgment in part, reverse in part, and remand with directions to (1) specify the bases for the court's reduction to CR Realty's receiver's fees and (2) apply the *Plote* burden-shifting framework to CR Realty's motion for final accounting and determine the reasonableness of the fees requested in that motion.

¶ 91        Affirmed in part, reversed in part; cause remanded with directions.