2026 IL App (4th) 250121

NO. 4-25-0121

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 25, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| PEPSICO, INC., and AFFILIATES, | ) | Appeal from the |
| Plaintiffs-Appellants, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| THE DEPARTMENT OF REVENUE; DAVID C. | ) | No. 22TX155 |
| HARRIS, in His Official Capacity as Director of | ) | |
| Revenue; and MICHAEL W. FRERICHS, in His | ) | Honorable |
| Official Capacity as Treasurer of the State of Illinois, | ) | Robin L. Schmidt, |
| Defendants-Appellees. | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Lannerd and DeArmond concurred in the judgment and opinion.

**OPINION**

¶ 1 In this tax dispute, plaintiffs, PepsiCo, Inc. (PepsiCo), and affiliates, appeal a

judgment in favor of defendants—the Department of Revenue (Department), David C. Harris, in

his official capacity as Director of Revenue, and Michael W. Frerichs, in his official capacity as

Treasurer of the State of Illinois. We affirm.

¶ 2                                  I. BACKGROUND

¶ 3                   A. Overview of the Complaint and Disputed Issues

¶ 4         Illinois law requires corporations to file combined income tax returns for their

entire "unitary business group" as if they are a single taxpayer, reporting income generated within

the state by all members of the group under an apportionment formula. 35 ILCS 5/304(e), 502(e)

(West 2016). Beginning in tax year 2011, plaintiffs excluded Frito-Lay North America, Inc.

(FLNA), a wholly owned subsidiary of PepsiCo, from plaintiffs' unitary business group on Illinois

tax returns. The basis for this exclusion was plaintiffs' claim that recent corporate restructuring resulted in more than 80% of FLNA's property and payroll being located outside the United States. See 35 ILCS 5/1501(a)(27)(A) (West 2016) (establishing that an entity is not part of a unitary business group if 80% or more of its property and payroll are outside the United States). By excluding FLNA, a profitable entity, from the unitary business group pursuant to this "80/20 rule," plaintiffs reported losses on their Illinois returns and thus paid no income tax.

¶ 5 The Department audited plaintiffs' returns and found that FLNA should not be excluded from plaintiffs' unitary business group. Specifically, the Department took the position that, to calculate whether FLNA was an "80/20 company," FLNA was not entitled to include payroll expenses attributable to certain personnel from the United States who performed temporary assignments for foreign PepsiCo affiliates. In the Department's view, the entity that ostensibly employed those expatriates, PepsiCo Global Mobility, LLC (PGM)—whose operating attributes were designed to flow to FLNA for tax purposes—was (1) a shell company that lacked economic substance and (2) not the true employer of the expatriates. According to the Department, without including PGM's payroll in the calculations, FLNA did not have 80% or more of its property and payroll outside the United States.

¶ 6 Although the parties have litigated very similar issues for other tax years, the present action pertains only to tax years 2016 and 2017. Specifically, the Department issued notices of deficiencies to plaintiffs for those years totaling around $10.8 million, including statutory late-payment penalties. Plaintiffs paid the deficiencies under protest and filed this action against defendants in the circuit court of Sangamon County pursuant to section 2a of the State Officers and Employees Money Disposition Act (30 ILCS 230/2a (West 2016)). Only counts II and VI of plaintiffs' complaint are at issue on appeal. Specifically, in count II, plaintiffs sought

both a declaratory judgment and a refund based on their position that FLNA should not be included in plaintiffs' unitary business group for tax years 2016 and 2017. In count VI, plaintiffs alleged that the circumstances justified abating late-payment penalties.

¶ 7          B. The Facts Pertaining to FLNA's Status as an 80/20 Company

¶ 8          Although the matter proceeded to a bench trial, the parties did not dispute most of the facts relevant to determining whether FLNA was an 80/20 company in tax years 2016 and 2017.

¶ 9          1. *The Context Surrounding Plaintiffs' Decision to Form PGM*

¶ 10          The evidence showed that PepsiCo is a publicly traded corporation organized under North Carolina law, with its headquarters in New York. In conjunction with a network of affiliates, PepsiCo operates three principal business lines—beverages, snack foods, and grain-based foods— in approximately 200 countries. In the United States, FLNA manages snack-food operations out of Texas. FLNA sells products manufactured by one affiliate, Frito-Lay, Inc., to another affiliate, Rolling Frito-Lay Sales, L.P., which then distributes the products. In both 2016 and 2017, FLNA had gross sales of around $10 billion, 98% of which was attributable to sales within the United States, including Illinois.

¶ 11          Since at least the mid-1990s, plaintiffs have participated in an expatriate program, whereby high-ranking employees relocate to another country and perform assignments for foreign affiliates, typically for about three to five years. The program prepares expatriates for future leadership roles within PepsiCo's organization while fulfilling the business needs of foreign host companies. The majority of participants in this program work at least partially for PepsiCo's snack-food business.

¶ 12          Expatriated workers generally do not want to be employed directly by foreign

PepsiCo affiliates during temporary assignments because doing so would interfere with benefits linked to employment in the United States, such as compensation, retirement plans, and health insurance. By the same token, profitable American entities associated with PepsiCo do not want expatriates on their own payrolls, as doing so could subject such entities to foreign taxation and liability for expatriates' unauthorized actions. Thus, until 2011, a PepsiCo affiliate based in the United States called Beverages Foods & Services Inc. (BFSI), which did some business with the military but did not earn a profit, served as the designated employer for United-States-based workers who were assigned to work temporarily with foreign host companies as part of plaintiffs' expatriate program. Having the expatriates employed by BFSI allowed expatriates to retain their compensation and benefits without requiring profitable American entities to establish a permanent presence in foreign countries. Until 2011, plaintiffs repeatedly characterized BFSI as an 80/20 company for purposes of Illinois taxation, evidently without any resistance from the Department. However, there is no indication in the record that plaintiffs ever attempted to use BFSI's status as an 80/20 company as a method of shielding a different profitable affiliate company from Illinois income taxation.

¶ 13    In 2010, plaintiffs restructured their global business with assistance from PriceWaterhouseCoopers (PwC). Part of that restructuring included removing manufacturing plants in the United States from FLNA's ownership and reassigning some of FLNA's employees to PepsiCo, Frito-Lay, Inc., and Rolling Frito-Lay Sales, L.P. Also in 2010, plaintiffs acquired two large companies that had previously served as independent bottlers of Pepsi products. Those independent bottlers historically used their own entities to employ personnel performing temporary assignments overseas.

¶ 14    After acquiring the independent bottlers, in consultation with PwC, plaintiffs

recognized it was prudent to use one entity rather than three to employ expatriates. However, it was deemed inadvisable to have BFSI serve as the employer going forward, as BFSI did other business with the military. Thus, the decision was made to form a new entity, called PGM, whose sole purpose would be to employ workers from the United States who participated in plaintiffs' expatriate program. An entity that functions solely to employ a multinational business's temporary expatriates is known as a global employment organization (GEO), alternatively referred to in the record as a global employment company.

¶ 15       Charles Mueller, PepsiCo's vice president of state and local taxes, was tasked with deciding where to place PGM within plaintiffs' recently reorganized corporate structure. Mueller recognized that, if PGM were set up as a disregarded tax entity whose operating attributes flowed to FLNA, more than 80% of FLNA's payroll and property would be located outside the United States, allowing plaintiffs to exclude FLNA from their unitary business group for purposes of some states' income taxation, including Illinois. See 26 C.F.R. § 301.7701-3(b)(1)(ii) (2006) (establishing that a single-member limited liability company will be disregarded as an entity separate from its owner, unless the taxpayer elects otherwise). Thus, Mueller recommended setting up PGM as a limited liability company, with FLNA as the sole member. Pursuant to Mueller's recommendations, in June 2010, plaintiffs formed PGM as a limited liability company under Delaware law and made no election to be treated other than the default for tax purposes. According to a PowerPoint presentation in the record prepared for plaintiffs' internal use in September 2010, plaintiffs contemplated that restructuring the expatriate program this way would save $14 million per year in state taxes by taking advantage of the 80/20 rule.

¶ 16       Beginning in tax year 2011, plaintiffs excluded FLNA from their unitary business group on their Illinois returns. The Department repeatedly audited plaintiffs' returns and disputed

the characterization of FLNA as an 80/20 company. The parties' disagreements pertaining to tax years 2011 through 2015 eventually wound up before the Illinois Independent Tax Tribunal.

¶ 17          2. *The Evidence Regarding How the Expatriate Program*

*Operated in Tax Years 2016 and 2017*

¶ 18          The evidence showed that plaintiffs' human resources department operated in a centralized structure, allowing thousands of workers employed by various entities to serve affiliates all over the world. As it pertains to the issues in this appeal, in 2016 and 2017, a core group of senior management personnel, all of whom were employed by one entity or another affiliated with PepsiCo other than PGM, were responsible for matching potential expatriates with foreign subsidiary companies. Twenty-three other people in human resources were then responsible for implementing the expatriate program as part of their work for the Global Mobility HR Function. In 2016 and 2017, one member of the Global Mobility HR Function was designated as being employed by PGM, as he was temporarily assigned to work with a foreign PepsiCo affiliate in Dubai as part of the expatriate program. All other people who did work for the Global Mobility HR Function were employed either by PepsiCo or foreign affiliates. Less than 30% of the total workload of the members of the Global Mobility HR Function was devoted to serving PGM and its expatriates.

¶ 19          Some human resources personnel who did work for the Global Mobility HR Function were designated as officers of PGM. PGM had other officers, all of whom likewise worked for some affiliate within the PepsiCo organization. For example, Mueller, an employee of PepsiCo, was designated as an officer of PGM because he was responsible for signing tax returns for all PepsiCo affiliates based in the United States. Some of PGM's officers were expatriates at one point or another who, like all other expatriates after 2011, were ostensibly employed by PGM

during the terms of their foreign assignments. Officers were not compensated for their roles as officers and did not hold formal meetings specific to PGM's business.

¶ 20　　　For each expatriate, an officer of PGM signed a largely standardized secondment agreement with a representative of a foreign host company. The secondment agreements outlined that expatriates would be deemed to be employed by PGM during the assignment terms but would perform work under "the full direction, control and supervision" of the host companies on a day-to-day basis. To that end, expatriates would have no authority to "conduct any business in the name of or on behalf of" PGM, including negotiating on behalf of PGM or binding it to any contract with a third party. The secondment agreements provided that expatriates would be on PGM's payroll. However, host companies would reimburse PGM for costs related to expatriates' compensation, benefits, and business expenses, along with providing additional local benefits and liability insurance coverage. Host companies were also required to make reasonable efforts to assist expatriates with any problems or local legal difficulties that might arise. Under the secondment agreements, host companies had the authority to terminate expatriates' assignments but not expatriates' overall employment.

¶ 21　　　Aside from secondment agreements, PGM's officers executed letters of understanding with each expatriate. Those letters of understanding likewise indicated that PGM would be deemed the employer during the term of the foreign assignment.

¶ 22　　　The evidence showed that expatriates received paychecks and tax documents bearing PGM's name, although a third-party vendor was responsible for processing the payroll. Foreign host companies reimbursed PGM for payroll costs dollar-for-dollar, without markups. This practice violated both federal tax laws and PepsiCo's own corporate policies regarding transfer pricing, which required affiliates to charge appropriate markups when transacting business

with each other. PGM owned no property, had no bank account of its own, and operated at a loss.

¶ 23        The evidence further showed that foreign host companies typically paid the costs associated with relocating expatriates. Host companies would also provide phones and laptops for expatriates. Consistent with the terms of the secondment agreements, managers at foreign host companies directed and evaluated expatriates during their terms of foreign assignments. Based on those evaluations, an executive compensation team, which was part of plaintiffs' centralized human resources department, determined pay increases for expatriates.

¶ 24        The parties stipulated that no intercompany payment was made by or on behalf of PGM to reimburse PepsiCo for the human resources services it provided. Seemingly contradicting that stipulation, Mueller testified that foreign host companies started reimbursing the Global Mobility HR Function for services provided to expatriates in 2017. Nevertheless, the evidence showed that there was no reimbursement for 2016, and never at a markup.

¶ 25        At the end of an expatriate's term, members of plaintiffs' human resources team decided on the next assignment for the worker. Given that most of the expatriates held high-ranking positions and were selected with a view toward developing them for future leadership roles, it was very uncommon that expatriates were fired during the term of a foreign assignment. In the rare case an expatriate's employment was terminated, that decision-making process included the person's manager from the foreign host company and various individuals associated with PepsiCo's centralized human relations department, some of whom were also officers of PGM. The record contains a few severance agreements negotiated with expatriates, either upon termination or retirement. Each of those agreements listed not only PGM, but PepsiCo and its affiliates, as part of the definition of the "Company" for purposes of the severance. Although most expatriates completed their terms, there were occasions when PGM terminated an expatriate's assignment

because the expatriate accepted another assignment during their term.

¶ 26    C. The Expert Testimony Regarding Whether FLNA

Was an 80/20 Company

¶ 27    At trial, both plaintiffs and defendants relied on expert testimony in support of their respective positions as to whether FLNA was an 80/20 company for purposes of Illinois income taxation.

¶ 28    Plaintiffs' expert was Rachel D'Argenio, an employee of Ernst & Young who specialized in advising clients about GEOs. She testified about the utility and structure of GEOs generally but did not directly offer opinions specific to PGM's operations. Nevertheless, many of the attributes that D'Argenio explained were typical of GEOs coincided with other trial evidence as to how PGM functioned. D'Argenio acknowledged that GEOs adhere to transfer pricing principals to charge markups for services provided to related entities so that transactions are at arm's length. However, if a GEO did not pay or receive required markups for services, that would not affect her opinion regarding the legitimacy of that GEO.

¶ 29    Harry Rosenbloom, a lawyer and professor specializing in international taxation, testified for defendants. Overruling plaintiffs' ongoing objections that Rosenbloom should not be allowed to testify to legal conclusions, the trial court allowed Rosenbloom to explain why he believed that PGM lacked economic substance as an entity and did not otherwise qualify as the expatriates' employer under a common-law analysis.

¶ 30    D. Evidence Relevant to Plaintiffs' Request to Abate Penalties

¶ 31    Aside from the issue of whether FLNA qualified as an 80/20 company, the parties disputed whether plaintiffs made a good-faith effort to ascertain their tax liability for 2016 and 2017, thus justifying abating statutory late-payment penalties.

¶ 32 The evidence showed that plaintiffs generally had a good history of tax compliance in Illinois and filed timely returns. Mueller testified that, before plaintiffs began filing Illinois tax returns that designated FLNA as an 80/20 company, he researched the law and discussed the matter with others, including his colleagues, a law firm, and PwC. However, Mueller acknowledged there was no documentation reflecting that process, nor did he obtain a written outside opinion to support plaintiffs' position that FLNA was an 80/20 company. The evidence also showed that plaintiffs filed their 2016 and 2017 Illinois tax returns while plaintiffs had an ongoing dispute with the Department in the Illinois Independent Tax Tribunal pertaining to whether FLNA qualified as an 80/20 company for tax years 2011 and 2012.

¶ 33                                        E. The Trial Court's Judgment

¶ 34 On January 9, 2025, the trial court entered a written judgment in defendants' favor on counts II and VI of the complaint. The court reasoned as follows.

¶ 35 PGM was a " 'shell' " company that existed only "on paper" and was established to "shield [FLNA] from tax liability." Participants in the expatriate program were not the common-law employees of PGM, and the payroll for those expatriates must not be included in the calculation to determine whether FLNA was an 80/20 company. Plaintiffs did not meet their burden to prove that FLNA conducted at least 80% of its business outside the United States. To that end, "the expatriate compensation charged to PGM does not represent substantive foreign business activities conducted by [FLNA] through PGM," and FLNA "derives the majority of its profits from the purchase and resale of products in the United States." Ultimately, plaintiffs failed to provide clear and convincing evidence to rebut the presumption that the Department's assessment of tax liability was correct.

¶ 36 The trial court further determined that "no reasonable cause exists so as to abate the

late payment penalty," as plaintiffs failed to exercise "ordinary business care" in filing their Illinois combined returns. The court reasoned that "PepsiCo is a sophisticated taxpayer on notice for multiple years that its 80/20 position would be met with the Department's Notices of Deficiency." Additionally, " 'ordinary business care' was not established by PGM's reliance upon professional advice," as "[t]he testimony was clear that the professional advice relied upon was a best practice for avoiding state taxes in this manner."

¶ 37    In light of the final judgment for defendants on counts II and VI, the trial court dismissed as moot count I of plaintiffs' complaint, which requested a preliminary injunction. The court wrote that it understood the parties reached an agreement regarding the unrelated issues in counts III through V of plaintiffs' complaint. The court directed the parties to submit an agreed order with respect to those counts within 30 days.

¶ 38    F. Postjudgment Matters and the Notice of Appeal

¶ 39    On January 30, 2025, the trial court entered an agreed order dismissing counts III through V of plaintiffs' complaint. On February 5, 2025, the court granted defendants' motion to correct a clerical error in the January 9, 2025, order, thus resolving all pending issues in the litigation. Plaintiffs filed a timely notice of appeal.

¶ 40    II. ANALYSIS

¶ 41    On appeal, plaintiffs present three overarching arguments: (1) the trial court erroneously allowed Rosenbloom to offer opinions as an expert on the ultimate legal issues in the case, (2) the court erroneously determined that FLNA did not qualify as an 80/20 company, and (3) the circumstances justified abating late-payment penalties.

¶ 42    At the outset, we note that the Appellate Court, First District, recently addressed the second and third issues plaintiffs raise, but for tax years 2011 through 2013. The court affirmed

the Illinois Independent Tax Tribunal's decisions that (1) FLNA should be included in plaintiffs' unitary business group and (2) plaintiffs should be assessed penalties for failing to make a good-faith effort to determine their proper tax liability. *PepsiCo, Inc. v. Department of Revenue*, 2025 IL App (1st) 230913, ¶¶ 1-2. In their reply brief, plaintiffs ask us not to follow the First District's opinion.

¶ 43    Evidently, the parties' disputes relating to tax years 2014 and 2015 are still pending before the Illinois Independent Tax Tribunal.

¶ 44    A. Whether the Trial Court Erroneously Admitted and

Relied on Rosenbloom's Expert Opinions Pertaining to the

Ultimate Legal Issues in the Case

¶ 45    Plaintiffs first argue that the trial court erroneously admitted and relied on Rosenbloom's expert report and testimony for three reasons: (1) his opinions lacked a proper foundation in the evidence, (2) he inappropriately opined on the ultimate issues involved in the litigation, and (3) he offered legal conclusions. In presenting their positions on these points, plaintiffs maintain that the two disputed issues relevant to determining whether FLNA was an 80/20 company—whether PGM was the employer of the expatriates under a common-law analysis and whether PGM had economic substance—were "matter[s] of law." Plaintiffs propose that Rosenbloom's report was "tantamount to a legal brief that would be filed by counsel." Ultimately, plaintiffs assert that, although defendants "were permitted to make any of the same legal arguments through their counsel in briefing, they should have been precluded from advancing these legal opinions and conclusions through an expert witness."

¶ 46    Defendants respond that the trial court acted within its discretion by admitting Rosenbloom's report and testimony. Defendants propose that Rosenbloom's opinions had support

in the record, so plaintiffs' criticisms about a lack of factual foundation speak only to the weight to be attributed to the opinions. Moreover, according to defendants, experts are allowed to express opinions about the ultimate issues involved in a case, so that is not a valid basis to challenge Rosenbloom's testimony. Defendants acknowledge that experts may not testify to legal conclusions, such as how to interpret a statute or a contract. Nevertheless, in defendants' view, Rosenbloom's opinions were proper because he applied tax concepts to the facts of the case. Finally, defendants maintain that any error in admitting Rosenbloom's testimony was harmless, as there was ample evidence supporting the court's judgment and the court never indicated that it relied solely on Rosenbloom's opinions.

¶ 47 Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In other words, " '[a] witness will be allowed to testify as an expert if his experience and qualifications provide him with knowledge that is not common to the layperson and where such testimony will aid the trier of fact.' " *City of Chicago v. Concordia Evangelical Lutheran Church*, 2016 IL App (1st) 151864, ¶ 72 (quoting *Colella v. JMS Trucking Co. of Illinois*, 403 Ill. App. 3d 82, 90 (2010)). "The decision of whether to admit expert testimony is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *Concordia*, 2016 IL App (1st) 151864, ¶ 73. "An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the court's view." *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 74. However, even if a court abused its discretion in admitting evidence, to justify ordering a new trial, the party challenging that evidence bears the

burden to show that the error was substantially prejudicial and affected the trial outcome. *McHale*, 2015 IL App (1st) 132625, ¶ 74.

¶ 48 We begin with plaintiffs' challenge to the factual foundation for Rosenbloom's opinions. The law is well established that an expert's opinions must "have some evidentiary basis." *Concordia*, 2016 IL App (1st) 151864, ¶ 72. An opinion is inadmissible if it is bereft of evidentiary support and is nothing more than a guess or conjecture. *Concordia*, 2016 IL App (1st) 151864, ¶ 72. For example, if fact witnesses in a negligence action cannot establish how a plaintiff was injured, it would be inappropriate for an expert to fill that evidentiary gap by speculating about what might have happened. See *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 875-76 (1991) (where no eyewitnesses knew how the plaintiff fell off a boat and injured himself, the trial court properly disregarded expert affidavits attempting to establish a cause for the fall).

¶ 49 Plaintiffs argue that Rosenbloom's opinions lacked a foundation in the evidence. Among the points plaintiffs mention are that (1) Rosenbloom drafted his report before the record had been developed through more complete trial evidence and (2) Rosenbloom was the last witness to testify but did not account for the unrebutted facts established by plaintiffs' witnesses.

¶ 50 Contrary to what plaintiffs argue, Rosenbloom's opinions were sufficiently rooted in the testimony and were not improper speculation. He explained why the facts as he understood them to be from reviewing discovery materials led him to conclude that PGM lacked economic substance and was not the true employer of the expatriates. Plaintiffs' criticism that Rosenbloom failed to consider additional evidence goes to the weight to be attributed to the opinions, not admissibility. See *Concordia*, 2016 IL App (1st) 151864, ¶ 76 ("It was for the trial court to judge [an expert's] credibility and the weight of his findings in light of his testimony that he did not review the accounting CR Realty filed.").

¶ 51    To the extent plaintiffs complain about Rosenbloom testifying on the ultimate issues in the case, that is not a valid basis for challenging expert testimony. Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) expressly states that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Courts have recognized that an opinion on an ultimate issue involved in a case "does not impermissibly intrude on the fact finder's role," as the "trier of fact is free to reject the expert's conclusion." *Concordia*, 2016 IL App (1st) 151864, ¶ 74.

¶ 52    With that said, the parties agree that an expert may *not* testify to legal conclusions. *Caracci v. Patel*, 2015 IL App (1st) 133897, ¶ 28. One of the reasons for this rule is that "allowing an expert to render a legal conclusion invades the province of the court to instruct the jury." *Illinois Road & Transportation Builders Ass'n v. County of Cook*, 2023 IL App (1st) 231459, ¶ 140. To that end, no witness should "tell the court how to interpret the law." *Illinois Road*, 2023 IL App (1st) 231459, ¶ 138. Legal conclusions from experts also risk infringing on a jury's duties. *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009). Obviously, it would be problematic for an expert to testify to an interpretation of the law that differed from what the jury instructions said. See *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1059-60 (2001) (holding that a trial court abused its discretion by admitting expert testimony that constituted legal conclusions and was inconsistent with the jury instructions). But even if an expert does not expressly undermine the jury instructions, a contradiction attendant to an opinion containing legal conclusions can be more subtle. See *Brettman v. Virgil Cook & Son, Inc.*, 2020 IL App (2d) 190955, ¶ 84 (noting the risk that an expert's legal conclusions can convey unexpressed erroneous legal standards to a jury).

¶ 53    There is no bright-line test for identifying when an expert's opinions constitute improper legal conclusions. However, the parties direct our attention to some circumstances where

it is fairly clear that allowing expert testimony on a topic would usurp the roles of the judge or jury. For example, it is inappropriate for an expert to testify about how to interpret a statute (*Northern Moraine Wastewater Reclamation District v. Illinois Commerce Comm'n*, 392 Ill. App. 3d 542, 573 (2009)) or what the parties' contract language and actions revealed about their reasonable expectations (*Todd W. Musburger, Ltd.*, 394 Ill. App. 3d at 801).

¶ 54 Moreover, "[t]he line between permissible ultimate issue testimony and impermissible legal conclusions is not always easy to see." *Brettman*, 2020 IL App (2d) 190955, ¶ 85. This is especially true where, as in the present case, experts "opine[ ] on matters that are the subject of a statute or regulation," such as whether a person "is 'dangerous' within the meaning of the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2018))" or "an 'employee' under federal law." *Illinois Road*, 2023 IL App (1st) 231459, ¶ 138. Relevant here, it does not inherently violate the prohibition against legal conclusions for an expert to testify that somebody was an employee of a particular entity. See *McHale*, 2015 IL App (1st) 132625, ¶ 81 (holding that an expert did not usurp the role of the trial court by opining that a person was an employee of an entity for purposes of federal regulations, as the expert merely applied those regulations to the facts of the case).

¶ 55 Most of the cases the parties cite involve jury trials, whereas the present case involved a bench trial. Although the prohibition against experts offering legal conclusions "applies to bench trials as well as jury trials" (*Northern Moraine*, 392 Ill. App. 3d at 573), the risk of reversible error is reduced when a case is tried without a jury. As explained in *Illinois Road*:

" '[I]n the context of a bench trial, *** there is less danger that a slight usurpation by the witness of the court's role to instruct the fact-finder as to the law will result in confusion or prejudice, for the obvious reason that the court is the fact-finder. In

- 16 -

a bench trial, the trial court is presumed to know the law and consider only proper evidence in making its judgment.' " *Illinois Road*, 2023 IL App (1st) 231459, ¶ 140 (quoting *Roberts v. Zimmerman*, 2021 IL App (2d) 191088-U, ¶ 105).

¶ 56 Here, one of the ultimate issues for the trial court to decide was whether FLNA qualified as an 80/20 company in tax years 2016 and 2017, thus justifying the exclusion of that entity from plaintiffs' unitary business group. The parties' disagreement focused on whether plaintiffs were entitled to include in FLNA's calculations payroll expenses for expatriates who were ostensibly employed by PGM. Defendants' position was that FLNA could not include payroll expenses paid by PGM for two reasons: (1) PGM was not the true employer of the expatriates under a common-law employment analysis and (2) PGM lacked economic substance.

¶ 57 On appeal, plaintiffs assert that defendants' theories on those issues presented matters of law. Plaintiffs seem to argue that defendants were not entitled to present *any* expert testimony and should have been limited to advancing their theories in a legal brief as part of closing arguments. However, plaintiffs disregard that the parties introduced extensive complicated testimony and documentation relevant to PepsiCo's global corporate structure, the expatriate program, and PGM's operations. Although plaintiffs' expert witness, D'Argenio, did not directly opine on the nature of PGM's operations, she did so inferentially. For example, she testified that, if a GEO did not pay or receive markups in transactions with related entities, that would not affect her opinion regarding whether that entity was a "legitimate" GEO. Rosenbloom then testified for defendants, outlining the various facts leading him to conclude that PGM did not qualify as the employer of the expatriates under a common-law analysis and otherwise lacked economic substance.

¶ 58 Under the totality of the circumstances, the trial court was justified in finding that

Rosenbloom, a professor and attorney with substantial experience in international taxation, offered testimony that would assist the court's understanding of the complex evidence and issues involved in the litigation. See Ill. R. Evid. 702 (eff. Jan. 1, 2011) (allowing a qualified expert to testify to opinions if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"); *Concordia*, 2016 IL App (1st) 151864, ¶ 74 ("It was for the trial court, not our court, to determine whether [the expert's] testimony would be of assistance."). Moreover, contrary to what plaintiffs argue, determining whether PGM had economic substance and was the true employer of the expatriates presented factual issues, not exclusively legal ones. See *Northern Indiana Public Service Co. v. Commissioner of Internal Revenue*, 115 F.3d 506, 512 (7th Cir. 1997) (" 'Whether a corporation is carrying on sufficient business activity to require its recognition as a separate entity for tax purposes is a question of fact.' " (quoting *Bass v. Commissioner of Internal Revenue*, 50 T.C. 595, 602 (1968))); *Striker v. Commissioner of Internal Revenue*, T.C. Memo. 2015-248, 2015 WL 9474086, at *4 ("Whether a taxpayer is an 'employee' is a question of fact.").

¶ 59        Although plaintiffs characterize many of Rosenbloom's opinions as mere legal conclusions, Rosenbloom did not tell the trial court how it should interpret the language of any statute, regulation, or contract. Rather, Rosenbloom explained his views about how the facts applied to recognized legal standards, which is something experts do routinely. See *McHale*, 2015 IL App (1st) 132625, ¶ 81 (holding that there was no error in allowing an expert to apply a regulation to the facts of the case); *Perschall v. Metropolitan Life Insurance Co.*, 113 Ill. App. 3d 233, 237 (1983) (holding that a doctor did not offer an improper legal conclusion by opining that the plaintiff was " 'totally disabled' " under the definition used in an insurance policy).

¶ 60        In their reply brief, plaintiffs seem to suggest that *McHale* indicates that it is

*acceptable* for an expert to testify about whether somebody is an employee for purposes of a federal regulation but *unacceptable* to testify about whether somebody is an employee under a common-law analysis. In the paragraph of the opinion plaintiffs reference, the appellate court stated that the subject expert testified about employment for purposes of federal regulations, but he "did not opine that an 'employee' under the regulations is an agent or an employee at common law." *McHale*, 2015 IL App (1st) 132625, ¶ 78. Plaintiffs read too much into this language. Noting that an expert did not comment on an issue is not the same thing as holding that the result of the appeal would have been different had the expert commented on that issue.

¶ 61        We remain mindful that a trial court abuses its discretion only if the "court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would adopt the court's view." *McHale*, 2015 IL App (1st) 132625, ¶ 74. Given the complexity of the facts and issues involved in this case, the lack of a bright-line test to ascertain when an expert's opinion crosses into impermissible legal conclusions, and the fact that this was a bench trial, we cannot say that the court abused its discretion by admitting or relying on Rosenbloom's report and testimony.

¶ 62        Even if some portions of Rosenbloom's opinions constituted legal conclusions, plaintiffs offer very little argument as to why any error was prejudicial and requires retrial. Again, a party challenging evidence bears the burden of showing that the error was substantially prejudicial and affected the trial outcome. *McHale*, 2015 IL App (1st) 132625, ¶ 74. Plaintiffs do not argue that Rosenbloom made any incorrect statement of law in his testimony. Plaintiffs also do not explain why the result of trial would have been different had the trial court barred Rosenbloom from testifying. To the contrary, plaintiffs acknowledge that defendants were entitled to present their positions, which the court ultimately accepted, that PGM lacked economic substance and was not the true employer of the expatriates. There is no reason to suspect that the

court would have reached different conclusions had defendants raised those points exclusively in a written closing argument rather than also through Rosenbloom's testimony. Indeed, as explained below, the trial evidence overwhelmingly showed that PGM lacked economic substance and was not the true employer of the expatriates. Under the circumstances, any error in allowing Rosenbloom's testimony and report does not require a new trial.

¶ 63                     B. Challenges to the Trial Court's Finding that FLNA

Was Not an 80/20 Company

¶ 64          In multiple sections of their brief, plaintiffs raise arguments collectively challenging the trial court's finding that FLNA was not an 80/20 company. The parties debate the following points relevant to this issue: (1) whether the court's order contained erroneous statements of law and fact, (2) whether the evidence showed that PGM was the common-law employer of the expatriates, and (3) whether the evidence showed that PGM lacked economic substance. Ultimately, we hold that plaintiffs have failed to identify significant legal or factual errors in the court's order and that the court's central findings were supported by the evidence.

¶ 65          The parties disagree about what our standard of review should be for some of plaintiffs' rather nuanced arguments. In their appellants' brief, plaintiffs assert generally that we should review legal issues *de novo* and factual determinations under the manifest-weight-of-the-evidence standard. In their appellees' brief, defendants propose that we should review the trial court's decision under the manifest-weight standard. In their reply brief, plaintiffs assert that we should review the court's "few" factual determinations (which plaintiffs do not identify) under the manifest-weight standard. By contrast, plaintiffs also assert in their reply brief that we should apply *de novo* review to legal issues, such as "the statutory requirements of the 80/20 Rule, the appropriate test to determine whether PGM was the common law employer, and whether the

economic substance doctrine can be used to disregard PGM."

¶ 66 As we will explain, although plaintiffs present a comprehensive critique of the trial court's order and attempt to cast portions of their challenge as questions of law, addressing the parties' disputes does not require us to delve into purely legal issues. Calling an issue a question of law does not make it one if the party is really just challenging a court's factual conclusions. See *Zebra Technologies Corp. v. Topinka*, 344 Ill. App. 3d 474, 481 (2003) ("Although taxpayer characterizes this issue as a flawed legal conclusion made by the trial court to be reviewed *de novo*, we view this contention as a factual decision that will be disturbed only if against the manifest weight of the evidence.").

¶ 67 The matters the trial court addressed involved questions of fact, specifically, whether PGM was (1) an entity with economic substance and (2) the common-law employer of the expatriates. See *Northern Indiana Public Service Co.*, 115 F.3d at 512 (" 'Whether a corporation is carrying on sufficient business activity to require its recognition as a separate entity for tax purposes is a question of fact.' " (quoting *Bass*, 50 T.C. at 602)); *Striker*, 2015 WL 9474086, at *4 ("Whether a taxpayer is an 'employee' is a question of fact."). Additionally, this case comes to us after a bench trial, and we generally review judgments in that posture under the manifest-weight-of-the-evidence standard. *Diocese of Quincy v. Episcopal Church*, 2014 IL App (4th) 130901, ¶ 38.

¶ 68 In reviewing a judgment under the manifest-weight standard, the appellate court may not overturn a trial court's findings merely because it disagrees with that court or might have reached a different conclusion. *Diocese of Quincy*, 2014 IL App (4th) 130901, ¶ 38. Rather, "[a] judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or if it appears to be arbitrary, unreasonable, or not based on the evidence." *Diocese of Quincy*,

2014 IL App (4th) 130901, ¶ 38.

¶ 69    In conducting our review of the evidence, we must also consider that a taxpayer relying on the 80/20 rule to claim an exemption from income taxation "has the burden of proving clearly that it comes within the statutory exemption." *Zebra Technologies Corp.*, 344 Ill. App. 3d at 484. "Such exemptions are to be strictly construed, and doubts concerning the applicability of the exemptions will be resolved in favor of taxation." *Zebra Technologies Corp.*, 344 Ill. App. 3d at 484.

¶ 70    1. *Whether the Trial Court's Order Contained Erroneous*

*Statements of Law and Fact*

¶ 71    Plaintiffs object to the trial court's statement in its order that "the expatriate compensation charged to PGM does not represent substantive foreign business activities conducted by Frito-Lay through PGM and that Frito-Lay derives the majority of its profits from the purchase and resale of products in the United States." Plaintiffs argue that, by referencing "substantive foreign business activities," the court imposed an "amorphous" requirement that is not found in section 1501(a)(27)(A) of the Illinois Income Tax Act (35 ILCS 5/1501(a)(27)(A) (West 2016)). That statute says that a unitary business group excludes entities that have at least 80% of their property and payroll outside the United States.

¶ 72    We discern no obvious error in the trial court's statement. It seems the court may have been reiterating or expanding on its finding, made more explicit earlier in the order, that PGM lacked economic substance: *i.e.*, it was a " 'shell' company" that existed only "on paper" to "shield [FLNA] from tax liability." To that end, the court's language in the statement at issue can be interpreted as referencing the economic substance doctrine. See *Northern Indiana Public Service Co.*, 115 F.3d at 511 ("The Tax Court relied on a line of cases for the principle that so long as a

- 22 -

foreign subsidiary conducts *substantive business activity*—even minimal activity—the subsidiary will not be disregarded for federal tax purposes, notwithstanding the fact that the subsidiary was created with a view to reducing taxes." (Emphasis added.)). Plaintiffs have not presented a convincing argument that the court imposed any "amorphous" requirement for an entity to qualify as an 80/20 company. Rather, the court seems to have referenced the economic substance doctrine, which, as explained below, is a recognized basis for a taxing authority to dispute the legitimacy of a transaction.

¶ 73    Plaintiffs also find error in the following statement in the trial court's order, which was included in the court's discussion of whether the circumstances warranted abating statutory penalties: "The testimony was clear that the professional advice relied upon was a best practice for avoiding state taxes in this manner." Plaintiffs maintain that the court misunderstood the evidence, as their outside advisor, PwC, did not advise them about state tax avoidance. Rather, plaintiffs insist that PwC advised them to form PGM for valid business purposes and only later did Mueller consider state tax consequences when deciding where to place PGM within PepsiCo's corporate structure.

¶ 74    We see no error in this statement, either. Plaintiffs assume that the trial court misunderstood PwC's role in setting up PGM. However, in their written closing argument, plaintiffs expressly argued that PwC advised them to form PGM for business reasons unrelated to state taxation. We assume that the court understood plaintiffs' arguments and what the evidence showed. In the subject statement, the court likely was referencing plaintiffs' *internal* decision-making process about where to place PGM within PepsiCo's corporate structure. The evidence indeed showed that Mueller, a tax professional, recommended having PGM's operating properties flow to FLNA so that FLNA would qualify as an 80/20 company. That was a method of state tax

avoidance.

¶ 75    Even if plaintiffs were correct that the trial court's order contains some misstatements, that would not be a reason to reverse the judgment. As explained below, the record supports the court's central findings that PGM lacked economic substance and was not the true employer of the expatriates.

¶ 76    2. *Whether the Evidence Showed That PGM Lacked Economic Substance*

¶ 77    Defendants argue that we may affirm the judgment on either of two independent bases: (1) the trial court properly found that PGM was not the common-law employer of the expatriates or (2) the court properly found that PGM lacked economic substance, and thus, its payroll should be disregarded for purposes of determining FLNA's status as an 80/20 company. The parties discuss both issues at length in their briefs. We choose to address first whether the trial court properly found that PGM lacked economic substance, justifying disregarding that entity's payroll for purposes of determining FLNA's status as an 80/20 company.

¶ 78    " 'The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.' " *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 67 n.6 (quoting *Gregory v. Helvering*, 293 U.S. 465, 469 (1935)). Accordingly, there is nothing inherently nefarious about structuring one's affairs with an eye toward obtaining tax benefits. However, there is a difference between legally minimizing one's taxes and evading taxation. See *First Chicago Building Corp. v. Department of Revenue*, 49 Ill. App. 3d 237, 240 (1977). To assist in making that distinction, "judicial anti-abuse doctrines have developed to 'prevent taxpayers from subverting the legislative purpose of the tax code.' " *Exelon Corp. v. Commissioner of Internal Revenue*, 906 F.3d 513, 523 (7th Cir. 2018) (quoting *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006)); see *Zebra*

*Technologies Corp.*, 344 Ill. App. 3d at 483 (noting that, although a taxpayer's payroll and property calculations complied with the language of the statute governing 80/20 companies, the court was not required to accept a company's 80/20 status "without further analysis or inquiry").

¶ 79        Here, both at the trial level and on appeal, the parties intermingle their discussions of two anti-abuse doctrines: the economic substance doctrine and the substance-over-form doctrine. Although those doctrines are closely related, they are not exactly the same. See *Rogers v. United States*, 281 F.3d 1108, 1115 (10th Cir. 2002).

¶ 80        The economic substance doctrine typically becomes relevant where the parties dispute whether a transaction had a meaningful economic reality apart from the motive to obtain a tax benefit. See *Rogers*, 281 F.3d at 1115-16. In other words, the doctrine addresses situations where "the economic substance of a transaction is insignificant relative to the tax benefits obtained." Dep't of the Treasury, The Problem of Corporate Tax Shelters: Discussion, Analysis and Legislative Proposals 56 (1999), https://home.treasury.gov/system/files/131/Report-Corporate-Tax-Shelters-1999.pdf [https://perma.cc/AY74-UWBV]. Although the present case involves Illinois taxation rather than federal taxation, we note that the Internal Revenue Code of 1986 states that a transaction has economic substance only if (1) "the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position" and (2) "the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." 26 U.S.C. § 7701(o)(1) (2018). The economic substance doctrine can become relevant where parties dispute whether transactions between related companies should be disregarded. See *Northern Indiana Public Service Co.*, 115 F.3d at 514 (addressing whether a foreign subsidiary company possessed economic substance when its sole purpose was to allow an American taxpayer to borrow money in Europe without being subject to withholding

requirements).

¶ 81        The substance-over-form doctrine, by contrast, generally becomes relevant where the parties disagree about the nature of a transaction's substance. See *Rogers*, 281 F.3d at 1115. This doctrine allows courts " 'to recharacterize transactions in accordance with their true nature.' " *Rogers*, 281 F.3d at 1115 (quoting John P. Warner, *Statutory, Regulatory, and Common Law Anti-Abuse Weapons*, 485 PLI/Tax 883, 889 (2000)). For example, in *BB&T Corp. v. United States*, 523 F.3d 461, 475 (4th Cir. 2008), the court held that, although a party structured a transaction as a lease and sublease, the substance of the transaction showed that it should instead be treated as a financing arrangement.

¶ 82        Both the substance-over-form doctrine and the economic substance doctrine can involve factual scenarios where a company serves as a mere "conduit" to facilitate a transaction between other parties. For example, *JI Aviation, Inc. v. Department of Revenue*, 335 Ill. App. 3d 905, 919 (2002), was a substance-over-form case where the court held that a transaction that was arguably structured on paper as a sale from a retailer to a customer was actually a sale between a nonretailer and a customer, as the retailer merely served as a "pure conduit" for the nonretailer to achieve a like-kind exchange of property. *JI Aviation* was not an economic-substance-doctrine case, as the taxing authority never claimed that the overall transaction lacked substance or that the conduit-retailer lacked substance as an entity.

¶ 83        By contrast, in *Aiken Industries, Inc. v. Commissioner of Internal Revenue*, 56 T.C. 925, 934 (1971), the United States Tax Court held that a Honduran corporation's transactions lacked economic substance where that corporation "obtained exactly what it gave up in a dollar-for-dollar exchange" and "was merely a conduit for the passage of interest payments" between companies related to it. *Aiken Industries* exemplifies the economic substance doctrine more than

the substance-over-form doctrine, as the taxing authority questioned whether the entity that served as the conduit performed functions that had economic substance.

¶ 84　　　Here, the subject transactions involved transfers of labor between various entities associated with PepsiCo. Defendants are not seeking to recharacterize those transactions as anything other than transfers of labor. Nor do defendants appear to dispute that there were valid reasons why plaintiffs wanted to have an entity like PGM employ expatriates. To the contrary, defendants acknowledge that plaintiffs "could have structured PGM differently to give it more economic substance and potentially realize" the benefits that plaintiffs sought. Nevertheless, defendants maintain that, although PGM was designated as the employer of the expatriates, such designation was not entitled to respect for tax purposes, as PGM lacked economic substance, was a shell company, and functioned merely as a conduit for foreign host companies to pay expatriates. Because defendants question whether PGM had economic substance as an entity and whether it had a substantive role in the transfers of labor attendant to the expatriate program, the economic substance doctrine is the more fitting doctrine to guide our analysis.

¶ 85　　　In *PepsiCo*, as part of a discussion that was subsumed within the court's analysis of whether PGM employed the expatriates, the First District agreed with the Illinois Independent Tax Tribunal that PGM was a shell entity that lacked economic reality during tax years 2011 through 2013. See *PepsiCo*, 2025 IL App (1st) 230913, ¶¶ 59-62. Although plaintiffs argue that the First District's opinion was legally incorrect and factually distinguishable, we hold that the trial court here justifiably reached the same conclusion about PGM's lack of economic substance for tax years 2016 and 2017.

¶ 86　　　Plaintiffs emphasize that they decided to form PGM at PwC's recommendation for valid business purposes, such as (1) consolidating three employing entities into one after

purchasing independent bottling companies, (2) allowing expatriates to receive compensation and benefits as if they were employed within the United States, and (3) preventing profitable companies based in the United States from establishing a permanent presence in foreign countries or exposing themselves to liability there. According to plaintiffs, state tax considerations arose only later, when Mueller decided where to place the new employment entity within PepsiCo's corporate structure. Plaintiffs reason that, because legitimate business purposes motivated the formation (as opposed to placement) of PGM, there is no reason to disregard PGM's payroll for lack of economic substance.

¶ 87        In evaluating plaintiffs' arguments, we cannot ignore that BFSI already advanced most of the same goals for plaintiffs' expatriate program since the 1990s, long before PGM was formed. The record contains a PowerPoint presentation that was created in September 2010 for plaintiffs' internal use. According to this presentation, BFSI did not generate a profit, and "employing expatriates through BFSI mitigated the risk of exposing profits of other PepsiCo entities to taxation in foreign countries because of presence and/or activities of expatriates." Nevertheless, the presentation also explained that a project launched by "Corporate Tax & Legal" "revealed an opportunity for tax savings through a new employing entity." Specifically, PGM would employ the expatriates, and it was anticipated that this "will save PepsiCo approximately $14 million per year in taxes by taking advantage of the tax filing exclusion in 13 states under the '80/20 Company' rule."

¶ 88        Thus, the record gives rise to serious doubts as to whether plaintiffs had any nontax-motivated reasons for switching from having BFSI employ the expatriates to having PGM employ them. But even if plaintiffs had some plausible business purpose for deciding to form PGM, that would not end our inquiry under the economic substance doctrine. On that point, we consider the

following guidance from the Internal Revenue Service:

"For purposes of determining whether the codified economic substance doctrine applies, 'transaction' generally includes all the factual elements relevant to the expected tax treatment of any investment, entity, plan, or arrangement; and any or all of the steps that are carried out as part of a plan. Facts and circumstances determine whether a plan's steps are aggregated or disaggregated when defining a transaction.

Generally, when a plan that generated a tax benefit involves a series of interconnected steps with a common objective, the 'transaction' includes all of the steps taken together—an aggregation approach. This means that every step in the series will be considered when analyzing whether the 'transaction' as a whole lacks economic substance. However, when a series of steps includes a tax-motivated step that is not necessary to achieve a non-tax objective, an aggregation approach may not be appropriate. In that case, the 'transaction' may include only the tax-motivated steps that are not necessary to accomplish the non-tax goals—a disaggregation approach.

Whether the economic substance doctrine is relevant and whether a transaction should be disaggregated will be considered on a case-by-case basis, depending on the facts and circumstances of each individual case. For example, if transfers of multiple assets and liabilities occur and the transfer of a specific asset or assumption of a specific liability was tax-motivated and unnecessary to accomplish a non-tax objective, then the economic substance doctrine may be applied solely to the transfer or assumption of that specific asset or liability.

Separable activities may take many forms including, for example, the use of an intermediary employed for tax benefits and whose actions or involvement was unnecessary to accomplish an overarching non-tax objective." I.R.S. Notice 2014-58, 2014-44 I.R.B. 746.

Here, plaintiffs have not shown that accomplishing their goal of forming a new entity to employ all expatriates from the United States required organizing PGM so that its operating attributes flowed to FLNA for tax purposes. Indeed, so far as the record shows, plaintiffs could have chosen to place PGM elsewhere within the PepsiCo organization's domestic corporate structure. The evidence clearly showed that state tax avoidance was plaintiffs' only reason for forming PGM as a limited liability company with FLNA as its sole member. The purpose of anti-abuse doctrines is to allow courts to peek behind the curtain to see whether the circumstances justify the tax benefits the taxpayer seeks. Thus, we reject plaintiffs' suggestion that any conceivable legitimate business reason prompting the initial idea to form a new employing entity precludes us from considering how PGM was actually established and operated.

¶ 89        The record overwhelmingly supports the trial court's finding that PGM was a " 'shell' " entity that existed only "on paper." See Andrew C. Liazos, *Global Employment Company: Is It the Right Fit for Your Organisation?*, Nat'l L. Rev. (Apr. 10, 2014), https://natlawreview.com/article/global-employment-company-it-right-fit-your-organisation [https://perma.cc/432B-SXM7] (warning that GEOs must be "more than a shell existing only on paper"). PGM owned no property and had no bank account. Its only purported business was to serve as the employer of the expatriates, yet PGM employed no managers or human resources personnel. Rather, foreign host companies supervised the expatriates and reimbursed PGM at cost for all expenses associated with the expatriates' compensation and benefits. Additionally, the

secondment agreements between PGM and foreign host companies established that expatriates had no authority to "conduct any business in the name of or on behalf of" PGM.

¶ 90    The people who implemented the "nuts and bolts" of the expatriate program each worked for plaintiffs' centralized human relations department, which served all of PepsiCo's global affiliates. In tax year 2016, PGM did not reimburse the centralized human relations department for services received. Mueller testified that foreign host companies may have directly reimbursed PepsiCo's centralized human relations department for services provided to PGM in tax year 2017. However, bypassing PGM in that manner undercuts rather than supports plaintiffs' claim that PGM had economic substance as a distinct entity. And any reimbursement that occurred in 2017 was at cost, without a markup.

¶ 91    Plaintiffs note that, in 2016 and 2017, one person who helped implement the expatriate program as a member of the Global Mobility HR Function was on PGM's payroll. However, that was because the individual was an expatriate himself, who was temporarily assigned to a PepsiCo affiliate in Dubai. Like other expatriates, that individual was subject to a secondment agreement prohibiting him from conducting business on PGM's behalf.

¶ 92    Plaintiffs also emphasize that PGM had officers who executed documents, such as secondment agreements and letters of understanding. But designating people as officers does not inherently give an entity or its transactions economic substance. Were it otherwise, a taxing authority would lack power to question whether a transaction had substance so long as a corporate taxpayer purported to conduct the transaction through officers. Anti-abuse doctrines look beyond labels and analyze the substance (or lack thereof) of what the taxpayer has done.

¶ 93    PGM's officers were employees of various corporate entities, all of which were affiliated with PepsiCo. For example, one of PGM's officers, Mueller, was designated as an officer

of PGM just to sign tax returns. The evidence showed there were no regular meetings of PGM's officers, nor were officers compensated for their services. Under the circumstances, the fact that PGM had officers who signed documents does not undermine the trial court's conclusion that PGM was a shell entity.

¶ 94 Plaintiffs assert that PGM had "real business purposes and ongoing business relationships" comparable to those in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978), where the United States Supreme Court addressed a transaction containing economic substance. The circumstances here are a far cry from those in *Frank Lyon*, where independent parties conducted a transaction after a competitive bidding process. See *Frank Lyon*, 435 U.S. at 582. We recognize that a transaction may survive scrutiny under the economic substance doctrine where it creates "genuine obligations enforceable by an unrelated party." *United Parcel Service of America, Inc. v. Commissioner of Internal Revenue*, 254 F.3d 1014, 1018 (11th Cir. 2001). Here, however, all parties to the labor transactions were affiliated with PepsiCo.

¶ 95 Of course, the fact that PGM did business with related entities does not inherently mean that it lacked economic substance. See *Wendy's International, Inc. v. Hamer*, 2013 IL App (4th) 110678, ¶ 33 (" 'Absent a fact pattern of sham or lack of business purpose, a court should accept transactions between related though separate corporations as proper and not disregard them because of the relationship between the parties.' " (quoting *Humana Inc. v. Commissioner of Internal Revenue*, 881 F.2d 247, 255 (6th Cir. 1989))). But the proverbial nail in the coffin for PGM is that its entire business was operated to benefit related for-profit entities while forgoing seeking any profit itself. See *BB&T Corp.*, 523 F.3d at 471 ("[U]nder the 'economic substance doctrine,' a transaction may be disregarded as a sham for tax purposes if the taxpayer 'was motivated by no business purposes other than obtaining tax benefits' and 'the transaction has no

economic substance because no reasonable possibility of a profit exists.' " (quoting *Rice's Toyota World, Inc. v. Commissioner of Internal Revenue*, 752 F.2d 89, 91 (4th Cir. 1985))). In considering whether a transaction between related entities has economic substance, an important consideration is whether the parties each sought to profit from the transaction. Compare *Northern Indiana Public Service Co.*, 115 F.3d at 513 (holding that a company's European subsidiary performed transactions that contained economic substance where the subsidiary earned a profit from issuing bonds on behalf of the parent company), with *Aiken Industries, Inc.*, 56 T.C. at 934 (holding that a Honduran corporation's transactions lacked economic substance where that corporation "obtained exactly what it gave up in a dollar-for-dollar exchange" and "was merely a conduit for the passage of interest payments" between companies related to it). Although PGM ostensibly provided compensation and benefits to expatriates, related foreign host companies reimbursed PGM dollar-for-dollar, with no markups. Comparable to *Aiken*, PGM served merely as a conduit for PepsiCo and its United States affiliates to exchange labor with foreign affiliates at cost. No independent business would have agreed to provide services to the PepsiCo organization under those terms. See *First Chicago Building Corp.*, 49 Ill. App. 3d at 241 (" 'The fact that a taxpayer may properly arrange its affairs to minimize taxation does not give it license to create purposeless entities or to engage in transactions with subsidiaries which independent parties would not dream of concluding.' " (quoting *United States Gypsum Co. v. United States*, 452 F.2d 445, 451 (7th Cir. 1971))).

¶ 96        Plaintiffs contend that the Department should have remediated PGM's failure to pay and receive markups on transactions with related entities by reallocating income in accordance with section 404 of the Illinois Income Tax Act (35 ILCS 5/404 (West 2016)), rather than seeking to disregard PGM's payroll for purposes of FLNA's 80/20 calculations. This argument is

unpersuasive and unsupported by citations of legal authority. PGM's failure to pursue a profit from transactions with related entities is one of the factors the Department was entitled to consider in deciding whether to challenge PGM's lack of economic substance. Essentially, plaintiffs are arguing on appeal that PGM would have had economic substance if the Department had imposed markups between related entities after the fact during audits. But plaintiffs filed returns claiming a large tax benefit for 2016 and 2017, and it was their obligation to structure the underlying transactions to justify that benefit. Importantly, a tax benefit pursuant to the 80/20 rule is "to be strictly construed," and any doubts regarding that rule's applicability "will be resolved in favor of taxation." *Zebra Technologies Corp.*, 344 Ill. App. 3d at 484.

¶ 97 Although plaintiffs extol the benefits of the expatriate program, PGM did not receive the benefits of any transactions but was merely a conduit that was bereft of substance as a distinct entity. And as the First District recognized, "any corporate benefits resulting from the expatriate program are attributable to the program itself and not PGM." *PepsiCo*, 2025 IL App (1st) 230913, ¶ 61. Ultimately, PGM was a " 'mere skeleton' " of a company. *Northern Indiana Public Service Co.*, 115 F.3d at 513 (quoting *Bass*, 50 T.C. at 602 n.3). It is clear that PGM's economic substance was nonexistent or at least insignificant relative to the millions of dollars in state tax savings plaintiffs claimed.

¶ 98 We hold that the trial court's finding that PGM lacked economic substance was not against the manifest weight of the evidence. Accordingly, the court properly determined that plaintiffs could not rely on PGM's payroll as part of determining whether FLNA was an 80/20 company. The evidence showed that FLNA did not qualify as an 80/20 company without PGM's payroll. We thus affirm the trial court's judgment in defendants' favor on count II of plaintiffs' complaint.

¶ 99                    3. *Whether the Evidence Showed That PGM Was the*

*Common-Law Employer of the Expatriates*

¶ 100           The parties separately debate whether PGM was the true employer of the expatriates under a federal common-law analysis of that issue. Having affirmed the judgment in defendants' favor on count II on the independent basis that PGM lacked economic substance, it is not strictly necessary for us to address principles rooted in employment law. However, as we explain, a common-law employment analysis presents a second basis to affirm the trial court's finding that FLNA was not an 80/20 company in tax years 2016 and 2017.

¶ 101           Illinois income tax regulations indicate that the term "employee" has the same meaning as under federal tax law. 86 Ill. Adm. Code 100.3100(b), amended at 17 Ill. Reg. 8,869 (eff. June 2, 1993). In turn, section 31.3401(c)-1(b) of Title 26 of the Code of Federal Regulations (26 C.F.R. § 31.3401(c)-1(b) (2010)) provides:

> "Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who

performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee."

Consistent with federal regulations, cases applying the common law in tax disputes say the following about determining a person's status as an employee:

" 'In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.' " *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1119-20 (9th Cir. 2011) (quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989)).

Some authority suggests that additional factors may be relevant. See, *e.g.*, *Professional & Executive Leasing, Inc. v. Commissioner of Internal Revenue*, 89 T.C. 225, 232 (1987) (noting that courts may also consider investment in the work facilities, the opportunity for profit or loss, the permanency of the relationship, and the relationship the parties think they are creating), *aff'd*, 862 F.2d 751 (9th Cir. 1988).

¶ 102    Plaintiffs insist that the factors typically cited in case law are designed to ascertain whether an individual is an independent contractor versus an employee, not to ascertain which of multiple potential employers is the true one. Plaintiffs argue that the most relevant factors for determining the true employer in situations involving workers who are loaned from one entity to another are (1) the right to control, (2) the right to discharge, (3) the permanency of the relationship, and (4) the relationship the parties believed they were creating.

¶ 103    Plaintiffs' exclusive focus on these four factors is at odds with the First District's decision in *PepsiCo*. See *PepsiCo*, 2025 IL App (1st) 230913, ¶ 48 (" 'While the cases which deal with the common law factors usually involve a determination of whether a person is an employee or an independent contractor, the principles are equally applicable to determine by whom an individual is employed.' " (quoting *Professional & Executive Leasing*, 89 T.C. at 232)). However, even if we consider only the factors plaintiffs want us to consider, plaintiffs have not presented a convincing argument that PGM was the employer of the expatriates.

¶ 104    With respect to the right to control, the secondment agreements stated that foreign host companies had the right to control the expatriates on a day-to-day basis. In support of their position that this factor nevertheless weighs in PGM's favor, plaintiffs note that expatriates were generally high-level employees within the PepsiCo organization who did not require the same degree of supervision as lower-level employees. In making that argument, plaintiffs overlook that (1) the evidence showed that foreign host companies indeed supervised, controlled, and evaluated expatriates during the terms of their assignments and (2) PGM employed no management personnel who could have controlled the expatriates' work. Thus, there is no evidence that PGM had any meaningful right or ability to control the expatriates.

¶ 105    With respect to the right to discharge employees, plaintiffs emphasize that only

PGM could terminate an expatriate's overall employment within the PepsiCo corporation. That is not entirely accurate. As explained in the preceding section, PGM was an entity without economic substance or reality beyond paper. Although it was very rare for expatriates to be fired, members of PepsiCo's centralized human resources department, who were employed by various entities throughout the PepsiCo organization other than PGM, would have been the ones to make decisions about whether to terminate an expatriate's employment, in conjunction with the manager from the foreign host company. Moreover, the evidence showed that foreign host companies had the right to terminate expatriates' assignments, which case law involving borrowed employees in the workers' compensation context says is synonymous with the right to discharge. See *Chaney v. Yetter Manufacturing Co.*, 315 Ill. App. 3d 823, 829 (2000). Thus, plaintiffs have not shown that this factor weighs in support of deeming PGM the employer of the expatriates.

¶ 106　　　　The permanency of the relationship is not a particularly important factor here. Although the expatriates' assignments were temporary, they were not brief. Expatriates typically worked with a foreign host company for three to five years. Also, once an expatriate's term expired, he or she would be reassigned to a new role somewhere within the PepsiCo organization and would no longer be associated either with PGM or the host company.

¶ 107　　　　The evidence certainly showed that plaintiffs believed that the expatriates were employees of PGM, as plaintiffs designated PGM as the employer in contracts. However, as the First District explained, " 'A contract which purports to create an employer-employee relationship is not controlling where an analysis of the common law factors as applied to the facts of the particular situation establish that such a relationship does not exist.' " *PepsiCo*, 2025 IL App (1st) 230913, ¶ 54 (quoting *United States v. Garami*, 184 B.R. 834, 838 (Bankr. M.D. Fla. 1995)). Calling PGM the employer, in itself, does not make PGM the employer.

¶ 108 In challenging the trial court's finding that PGM did not employ the expatriates, plaintiffs rely heavily on the United States Tax Court's analyses in *Striker* and *Gillis v. Commissioner of Internal Revenue*, T.C. Memo. 1986-576, 1986 WL 21786, both of which involved the United States military assigning its personnel to work for the North Atlantic Treaty Organization (NATO) temporarily. In those cases, the tax court determined that the United States military, not NATO, was the employer.

¶ 109 Plaintiffs unpersuasively attempt to extrapolate broadly applicable legal principles from these cases. The relationship between the United States and NATO is governed by international agreements and federal legislation. That is not directly analogous to PepsiCo transferring its employees from one entity within the organization to another. Moreover, as with all of the cases the parties cite in their respective discussions of employment law, *Striker* and *Gillis* did not involve a potential employer that lacked economic substance. Thus, *Striker* and *Gillis* do not control the outcome of this case.

¶ 110 In *PepsiCo*, the First District determined that PGM was not the employer of the expatriates for tax years 2011 through 2013. Here, the trial court properly reached that same conclusion for tax years 2016 and 2017. The court's ruling was not against the manifest weight of the evidence. We need not ascertain exactly which entity within the PepsiCo organization employed each expatriate, as it suffices to say that PGM was not the employer.

¶ 111 C. Abatement of Penalties

¶ 112 The final issue plaintiffs raise is whether the trial court erred by failing to abate penalties.

¶ 113 Section 3-3(b-20)(2) of the Uniform Penalty and Interest Act (35 ILCS 735/3-3(b-20)(2) (West 2016)) imposes a 20% penalty if a taxpayer fails to pay a tax before the Department

initiates an audit. However, section 3-8 of that same act (35 ILCS 735/3-8 (West 2016)) provides that such penalties "shall not apply if the taxpayer shows that his failure to *** pay tax at the required time was due to reasonable cause." Relevant here, the Department's regulations provide the following guidelines for evaluating whether reasonable cause exists:

"b) The determination of whether a taxpayer acted with reasonable cause shall be made on a case by case basis taking into account all pertinent facts and circumstances. The most important factor to be considered in making a determination to abate a penalty will be the extent to which the taxpayer made a good faith effort to determine his proper tax liability and to file and pay his proper liability in a timely fashion.

c) A taxpayer will be considered to have made a good faith effort to determine and file and pay his proper tax liability if he exercised ordinary business care and prudence in doing so. A determination of whether a taxpayer exercised ordinary business care and prudence is dependent upon the clarity of the law or its interpretation and the taxpayer's experience, knowledge, and education. Accordingly, reliance on the advice of a professional does not necessarily establish that a taxpayer exercised ordinary business care and prudence, nor does reliance on incorrect facts such as an erroneous information return.

d) The Department will also consider a taxpayer's filing history in determining whether the taxpayer acted in good faith in determining and paying his tax liability. Isolated computational or transcriptional errors will not generally indicate a lack of good faith in the preparation of a taxpayer's return." 86 Ill. Adm. Code 700.400(b)-(d), amended at 25 Ill. Reg. 5,038 (eff. Mar. 19, 2001).

¶ 114    In reviewing a determination as to whether reasonable cause justifies abating a tax penalty, we may reverse the decision only if it was "against the manifest weight of the evidence and if the opposite conclusion was clearly evident." *Horsehead Corp. v. Department of Revenue*, 2019 IL 124155, ¶ 46. To that end, "[i]f the record contains evidence to support the decision to impose penalties, it should be affirmed." *Horsehead Corp.*, 2019 IL 124155, ¶ 46.

¶ 115    In arguing that the trial court's decision not to abate penalties was against the manifest weight of the evidence, plaintiffs assert that they acted in good faith and exercised reasonable care in taking their position that FLNA constituted an 80/20 company. Plaintiffs emphasize their history of tax compliance and Mueller's testimony that he conducted research and spoke with outside advisors before classifying FLNA as an 80/20 company. Additionally, plaintiffs note that the Department never raised questions when plaintiffs classified BFSI—the entity that plaintiffs had previously used to employ expatriates—as an 80/20 company. Plaintiffs also reassert their argument that the court misunderstood the evidence by concluding that PwC advised them to form PGM as a means of avoiding state taxes.

¶ 116    We hold that the evidence reasonably supports the trial court's decision not to abate plaintiffs' penalties. As explained in the preceding section, there is no indication that the court misunderstood the evidence about PwC's role in forming PGM. Moreover, although plaintiffs assert that Mueller conducted a "vigorous analysis" to determine whether FLNA qualified as an 80/20 company, plaintiffs had no records documenting what that analysis entailed. Additionally, Mueller testified that he conducted some research about 80/20 corporations, but he did not explain why he believed PGM had economic substance or whether he even considered that issue. We agree with the First District's opinion in *PepsiCo*, wherein it recounted the Illinois Independent Tax Tribunal's observations:

" 'It is astounding that a sophisticated tax department, like PepsiCo's, would create such an aggressive tax strategy to create a non-operational shell company, [PGM], whose sole purpose was to make billions of dollars of FLNA's domestic snack line income, previously recognized for State of Illinois income tax calculations, disappear with a few strokes of a pen, without addressing the merits of such an endeavor with in-depth factual and legal analyses.' " *PepsiCo*, 2025 IL App (1st) 230913, ¶ 78.

¶ 117    Plaintiffs argue that, because the Department never questioned BFSI's status as an 80/20 company, that gave plaintiffs reasonable cause to believe BFSI's "successor entity," PGM, could similarly include the expatriates on its payroll. Plaintiffs' reasoning is unpersuasive. The record does not contain much information about BFSI. However, unlike PGM, BFSI evidently had at least some economic substance, as it sold products to the military in addition to being designated as the employer of expatriates. Moreover, as defendants note, there was no evidence that plaintiffs ever attempted to use BFSI's payroll to shelter an affiliate's profits from Illinois taxation.

¶ 118    Directing our attention to *Horsehead Corp.*, plaintiffs assert that, "[i]n cases such as this, Illinois courts routinely abate penalties." However, that case did not involve a shell entity that lacked economic substance. Rather, one of the major factors justifying abating penalties in that case was that there was no controlling case law or a statutory definition that could have assisted the taxpayer in ascertaining whether its out-of-state purchases of metallurgical coke were subject to use tax in Illinois. *Horsehead Corp.*, 2019 IL 124155, ¶ 49. Here, by contrast, the law is clear that taxpayers may not claim benefits based on transactions that lack economic substance. The PepsiCo organization, as a sophisticated taxpayer, should have foreseen the problems attendant to creating PGM as a GEO but failing to ensure it had economic substance and could withstand the

scrutiny of a common-law employment analysis.

¶ 119     We recognize that plaintiff had a history of tax compliance. On the other hand, plaintiffs characterized FLNA as an 80/20 company in their 2016 and 2017 returns despite knowing that the Department disagreed with that characterization for previous tax years. Thus, plaintiffs proceeded at their own risk by continuing to take an aggressive tax position on their returns for 2016 and 2017, especially considering that the evidence at trial showed that the operation of the expatriate program changed very little between 2011 and 2017.

¶ 120     Under the circumstances, the trial court's finding that plaintiffs failed to show reasonable cause for abating statutory penalties was not against the manifest weight of the evidence.

¶ 121                              III. CONCLUSION

¶ 122     For the reasons stated, we affirm the trial court's judgment.

¶ 123     Affirmed.

*PepsiCo, Inc. v. Department of Revenue*, 2026 IL App (4th) 250121

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 22-TX-155; the Hon. Robin L. Schmidt, Judge, presiding. |
| **Attorneys for Appellant:** | Catherine A Battin and Jane Wells May, of McDermott, Will & Schulte LLP, of Chicago, for appellants. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Leigh J. Jahnig, Assistant Attorney General, of counsel), for appellees. |